**UNITED STATES of America, Plaintiff,**

v.

**CERTAIN INTERESTS IN PROPERTY IN CHAMPAIGN COUNTY, STATE OF ILLINOIS; Chanute Gardens Corporation and Chanute Apartments Corporation, Defendants.**

**Civ. No. 1542–D.**

United States District Court
E. D. Illinois.
May 12, 1958.

Clifford M. Raemer, U. S. Atty., East St. Louis, Ill., Robert R. MacLeod, Atty., Dept. of Justice, Washington, D. C., Charles R. Young, Asst. U. S. Atty., Danville, Ill., for plaintiff.

Raymond R. Dickey, Washington, D C., Joseph M. Williamson, Urbana, Ill., Robert Rolnick, H. Struve Hensel, Washington, D. C., Harold Velde, Urbana, Ill., for defendants.

PLATT, Chief Judge.

This is a condemnation suit duly instituted by the United States to take two housing projects erected under the provisions of the "Wherry Act", 12 U.S. C.A. § 1748 et seq., upon Chanute Air Force Base at Rantoul, Illinois. The

declaration of taking was filed on May 1, 1957. One project, known as the Chanute Gardens, consists of apartments for non-commissioned officers and is owned by the defendant, Chanute Gardens Corporation. The other project, known as the Chanute Apartments, contains apartments for commissioned officers and is owned by the defendant, Chanute Apartments Corporation. Both projects were built by the Jonathan Woodner Company, who was the sponsor of the projects and the organizer of the defendant corporations. It was stipulated that the construction started on or about February 1, 1951, and that the projects were completed in March, 1953; that a jury would be waived and the cause submitted to the court to determine just compensation in the aggregate for the two projects; that the original cost to Jonathan Woodner Company was $8,297,969.23, exclusive of builder's and architect's fees, and that the court would view the premises. It was further stipulated that as of May 1, 1957 there was a need for an additional 450 units of military housing at Chanute Air Force Base.

The court has viewed the premises and examined the interior of two five-room apartments in each project and one six-room apartment in Chanute Apartments. The two projects are similar in outward appearance and construction. The Chanute Gardens consists of 13 storage and maintenance buildings and 102 buildings containing 378 five-room apartments, each with 819 square feet, and 224 six-room apartments containing 1050 square feet. The Chanute Apartments consists of 5 separate storage and maintenance buildings and 37 buildings containing 120 five-room apartments each with 922 square feet, and 78 six-room apartments each containing 1050 square feet. Some of the storage and maintenance buildings have laundry facilities.

The construction is wood frame with brick veneer facing on the first floor front and street side, and asbestos shingles covering the composition sheeting on the wood frame elsewhere. The foundation is concrete block. The apartments are heated by a forced warm-air heating system, from a gas fired furnace in each unit located in an enclosed closet in the kitchen. Each unit has individual hot water heaters. The first floor is about two feet above the ground surface. The floors are plywood placed on 2″ x 8″ floor joists and covered with asphalt tile. There are sliding metal door closets in the bedrooms, and one guest closet with sliding door on the first floor. The windows are steel casement and sash. The walls are one-half inch dry wall finish with the seams taped. Each apartment has a bath with "tylac" lining around the bathtub. All of the apartments are painted, have front and rear entrances and inside doors on the bedrooms. The first floor in each apartment contains a living room, dining room and kitchen. The bedrooms are located on the second floor. Gable roofs are covered with asphalt shingles.

Land improvements include circular streets with asphalt surface and the necessary sewage, water, electric and gas connections.

The ground consisting of some 69 acres for the Chanute Gardens and 27 acres for the Chanute Apartments, (the legal description appears in the leases), was leased by the Secretary of the Air Force to the corporations for a period of 75 years, at an annual rental of $100 for Chanute Gardens and $110 for Chanute Apartments, "to be used for the purpose of erecting, maintaining and operating a housing project."

The leases provided that the premises should be leased to military and civilian personnel designated by the Commanding Officer of the Chanute Air Force Base, provided that it might be leased to others after 30 days vacancy. The Commanding Officer was also given the privilege to replace non-military occupants.

Paragraph 4 of the leases provided:

"That if at any time during the term of this lease there is no mortgage insured under the National Housing Act covering the interest

of the Lessee and the leased premises are not under the control of the Commissioner, the rental rates for leases granted in accordance with Condition 3 shall be such rates as are agreed upon from time to time by the said Commanding Officer and the Lessee, provided, however, that, in case this lease shall be acquired by the Commissioner and subsequently assigned or sold, the rents shall not be reduced below the schedule of rents then in effect without the consent of the then owner · and holder of the leasehold interest."

Paragraph 18 of the leases provided:

"That except as otherwise specifically provided in this lease, all disputes concerning questions of fact or establishment of rental rates or standards of maintenance and repair after there is no mortgage held or insured by the Federal Housing Administration on the property and the leased premises are not under the control of the Commissioner, which may arise under this lease, and which· are not disposed of by mutual agreement, shall be decided by the said Commanding Officer, who shall reduce his decision to writing and mail a copy thereof to the Lessee at its address shown herein. Within thirty (30) days from said mailing the Lessee may appeal to the Secretary of the Air Force, whose written decision or that of his designated representative or representatives or board, shall be final and conclusive upon the parties hereto. Pending decision of a dispute hereunder, the Lessee shall proceed with the performance of this lease and in accordance with the Commanding Officer's decision. The provisions of this paragraph shall not be deemed to limit the provisions of Condition 4 of this lease with respect to rents."

█ The leases further provided that no assignment could be made without the Air Force consent, and that any local taxes levied upon the leaseholds would be paid by the lessees.[1] Also upon termination of the leases the buildings and improvements were to remain the property of the Government without compensation.

As of May 1, 1957, each leasehold was encumbered by a mortgage held by the New York State Employee's Retirement System, and guaranteed by the Federal Housing Administration. There was also outstanding a loan to the defendants from the Air Force to complete the projects. At the start of the trial it was stipulated that as of May 1, 1957, there was a total balance due on the mortgages of $6,145,694.31, and a balance due on the Air Force loan of $410,771.26, subject to any credits and offsets which the defendants might have.

The Government presented two real estate appraisers as witnesses. Mr. Walter Kuehnle, an experienced appraiser, testified that, in his opinion, the market value of the defendants' interest in the leaseholds, which he termed their "equity", as of May 1, 1957, subject to the mortgages but not the Air Force loan, was $360,000 for the Gardens and $250,000 for the Apartments, for a total of $610,000. He defined market value as "what a willing purchaser not forced to

---

1. Such leaseholds are taxable. Offutt Housing Co. v. Sarpy County, 1956, 351 U.S. 253, 76 S.Ct. 814, 100 L.Ed. 1151. But see P.L. 1020, § 511 (Aug. 7, 1956) in 42 U.S.C.A. § 1594 note, and U.S.Code Congressional Service, Vol. 1, p. 1315, 84th Cong.2d Sess. (1956).

Defendants offered in evidence without objection the decree of the Circuit Court of Champaign County, Illinois, dated May 22, 1957, in a suit by the defendants against the Board of Review of Champaign County, Illinois, et al. The decree fixed the amount of the taxes payable to the County of Champaign and its political subdivisions, for all assessments from the beginning of the "Wherry" projects to the date of the decree, and enjoined further assessment of taxes on the ground that the United States Government had paid large sums to local authorities which were found to be setoffs against future taxes under P.L. 1020. ibid.

buy will pay to a willing seller not forced to sell, both familiar with the property and the conditions." In reaching his conclusion Kuehnle studied, among other things, the community off the base to determine the economic rental potential, and the terms and restrictions of the mortgages and the Air Force leases. He determined that the maximum net rental income was limited to $321,515 for the Gardens and $119,370 for the Apartments. He based this upon his consideration of the FHA directives and the original project analyses compiled by the FHA which purported to limit the net rental return to 6½% of the original estimated construction cost. Kuehnle also considered the audits of rents and expenses for the years 1953 through 1956, raising and lowering various items which he thought justified according to his knowledge and experience in the management of such rental property. He noted an increase in monthly rentals for Chanute Gardens of $8.60 per apartment granted in June, 1954,[2] and a flat monthly charge of $8.40 per apartment in each project to cover the cost of cooking gas and electricity, which were not provided for in the original project analyses. Kuehnle believed this property to be investment property, and noted that the typical purchaser of such real estate resorts to financing. Finding that the cost of the mortgages guaranteed by the Federal Housing Administration was 4% plus ½% required for the payment of mortgage insurance, he testified that, in his opinion, these mortgages were quite favorable, considering prevailing mortgage interest rates as of May 1, 1957, and that if the properties were free and clear of these mortgages the value of the premises would be less. Kuehnle valued the projects according to capitalization of prospective income and replacement value. His opinion was that reproduction cost less depreciation of $633,558 amounted to $8,733,561 on May 1, 1957. He estimated the remaining useful life of the projects at 37 years. Kuehnle rejected net replacement cost as representing the fair cash market value for the reason that the income produced was not sufficient to justify it. He determined that prospective net income, after payment of mortgage principal and insurance but before depreciation allowance, would amount to $55,164 for Chanute Gardens and $35,199 for Chanute Apartments. In capitalizing this income, Kuehnle estimated that a willing purchaser would require a 15.4% yield on Chanute Gardens and a 14.3% yield on Chanute Apartments, and therefore multiplied the prospective income of the Gardens by 6.5 and of the Apartments by 7.4 to arrive at market value. Kuehnle referred to the sale of an apartment building in St. Louis, Missouri, in July, 1957, and to the sale of a housing project at Fort Devins, Massachusetts, on March 31, 1956, which attracted investments at yields of 14.3% and 16.1% respectively. Both of these projects were constructed under the National Housing Act.

The evidence disclosed that the defendants defaulted in their repayment of the Air Force loan and the Air Force took over the management of the projects on May 28, 1954. It was determined that a large savings in expense could be attained by the purchase of the distribution system for electricity, and the defendants attempted to induce the Air Force to allow the purchase of a distribution system. Purchase contracts were concluded but the purchase was never consummated. In determining the net prospective rentals Kuehnle took into consideration the savings which would have resulted from the purchase, and added $32,000 a year to the net rentals.

Mr. Dominick Dunn, the second real estate appraiser, testified that it was his opinion that the value of the defendants' interest in the leaseholds, subject to the mortgages but not the Air Force loan, amounted to $527,858 as of May 1, 1957. This valuation was determined by capitalizing prospective net income, after

---

2. There was evidence that defendants had made several other requests for rental increases, which were not allowed.

payment of mortgage principal, interest and insurance. Dunn estimated prospective rents from the audits of the corporations and the prevailing non-military rents in the community. He also considered the terms and restrictions in the mortgages and leases, and the inherent risk of investment in property of this nature. Dunn concluded that a purchaser would strive to recoup his investment in 15 years and would demand a 12% return on his investment. Dunn estimated replacement cost, less depreciation, at $8,251,385, but rejected this as determinative of market value. In his opinion depreciation amounted to approximately $916,800 on May 1, 1957, with the projects having a remaining useful life of 35 years.

Mr. Allen C. Gardner, a mortgage analyst, testified for the Government, and though he was not familiar with the premises here involved he estimated that a purchaser of the leaseholds subject to the mortgages might be satisfied with a return as low as 11% on his investment. Most of his testimony was incompetent and immaterial.

The defendants offered the testimony of Mr. Stanley Roe, a real estate appraiser. Roe concluded that the market value between a willing seller and a willing purchaser of the defendants' leasehold interests as of May 1, 1957 was, in his opinion, $8,743,914 free and clear of encumbrances. This valuation was attained by capitalization of prospective net income, the same method used by the Government witnesses. In determining prospective rent he included certain income from laundry facilities which were not being condemned. Therefore, the above valuation should be reduced by approximately $58,000. Roe disregarded the mortgage instruments and did not deduct the payment of mortgage principal and interest from his capitalized rental income. To reach capitalized value he used a multiplier of 14.5354 which would provide a return of 6½% upon the investment and also return the investment after 46 years. Roe compared the rents on the base with

those off the base but determined prospective income on the basis of free and fair rents without consideration of the terms of the leases or the actual rentals charged. He first stated that he would change the valuation of the premises if he assumed that the rents were controlled, but later said that in his valuation he assumed that the Government officials would be reasonable and thus would grant reasonable rental increases. It was his opinion that the FHA mortgages, with their low interest rates, would not enhance the value of the leaseholds. Roe fixed the replacement cost less depreciation, as of May 1, 1957, at $9,150,000. His estimate of depreciation was $350,000 and that of the remaining useful life of the premises was 46 years.

The defendants also presented Mr. George Duso, a cost estimator, as an expert witness to determine the replacement cost of the leaseholds as of May 1, 1957. He concluded that the replacement cost, excluding builder's and architect's fees, of Chanute Gardens was $6,722,868, and $7,551,125 including the fees. The replacement cost, as of the same date, of Chanute Apartments was estimated at $2,345,138, without the builder's and architect's fees, and $2,634,058 including such fees. Upon cross-examination Duso said that bids submitted by contractors on a ten million dollar project would range up or down from his estimate by some 5% to 20%.

Mr. Robert A. Nathan, a consulting economist from Washington, D. C., testified for the defendants that, based upon the study of construction cost trends, it was his opinion that construction cost increased 14.2% from 1951 to May, 1957. He noted that the original net rentals when the projects were first planned between the Government and the defendants were limited to 6½% of costs estimated as of 1950. In his judgment a 1957 capitalization of rents, which rentals were based upon 1950 estimated construction cost, would not fairly reflect the fair cash market value as of May 1,

1957, due to the sharp rise in cost of building starting with the Korean War.

Mr. Russell Law testified for the defendants that he was bookkeeper for Jonathan Woodner Company during the construction of the projects. He verified the amounts spent for materials and labor, and stated that he managed the projects for said Company until May 28, 1954. Subsequently Law continued as manager of the projects but took his orders from the Air Force and was paid by the defendant corporations.

Mr. Nathan B. Filbey testified for the defendants as to the correctness of the financial statements of the two corporations offered by the Government starting in 1953 when the projects were completed through 1956.

This is a brief summary of the evidence. From all the competent evidence and its view of the premises the court must determine what would be just compensation for the two projects.

 The Government contends that the compensation awarded should be for the interest of the defendants subject to the amount due on the notes secured by the mortgages. The complaint alleges that the interest condemned is all right, title and interest of the defendants in the leaseholds, subject to each mortgage. The *extent* and *kind* of estate to be acquired is to be determined by Congress. United States v. Kansas City, Kan., 10 Cir., 1946, 159 F.2d 125. The mortgagee's rights are determined according to state law. Swanson v. United States, 9 Cir., 1946, 156 F.2d 442, 447, 170 A.L. R. 258, certiorari denied Spokane Portland Cement Co. v. Swanson, 329 U.S. 800, 67 S.Ct. 492, 91 L.Ed. 684. Since in Illinois the mortgagee has only a lien and not a vested interest in the leaseholds, the Government will be vested with the entire title to the leaseholds and the mortgagee's lien is transferred to the award. City of Chicago v. Salinger, 1944, 384 Ill. 515, 52 N.E.2d 184, 154 A. L.R. 1104. The same rule is applicable in other lien states. United States v. Certain Lands in Borough of Brooklyn,

2 Cir., 129 F.2d 577; United States v 53¼ Acres of Land, More or Less, etc., 2 Cir., 139 F.2d 244; Swanson v. United States, supra. The mortgagee has a lien but no title in the leasehold. The Government could have carved out a lesser estate, such as an easement, or leasehold for only ten years, but clearly the Government is taking all of defendants' title or interest in the leaseholds. An interest *subject to a mortgage* is not a recognized legal estate in Illinois.

The Government insists that it has legal authority to condemn the interest subject to the mortgage by virtue of 42 U.S.C.A. § 1594a. Section 1594a(c) specifically refers to condemnation proceedings and states:

"Condemnation proceedings instituted pursuant to this section shall be conducted in accordance with the provisions of section 257 of Title 40, or any other applicable Federal statute."

There is no reference to condemnation subject to a mortgage in any other subsection of 1594a nor is there any applicable statute which the Government has cited which authorizes directly or indirectly condemnation of the entire estate subject to a mortgage.

 The mortgage indebtedness will be considered when the award is distributed. The mortgagee has been given notice of the taking of the interest of the defendants but it must be noted that in the notice no mention is made of taking subject to the mortgages. The Government insists that it may assume the mortgage indebtedness. The assumption of the indebtedness is not before the court at this time nor is there any evidence of such assumption. Upon distribution the Government may obviously assume the mortgages, if agreeable to the mortgagee. In such case the mortgagor is entitled to be relieved of his liability and will be so relieved by the transfer of the mortgage lien to the award. Therefore, the words "subject to the mortgage" are not applicable to the interest condemned. They do advise

the court of outstanding mortgages to be considered when the distribution is made. At this time these words must be omitted as surplusage.

The Government contends that only the capitalization of rents should be considered in the valuation of the defendants' interest. The Government is inconsistent in this contention since it offered evidence of reproduction cost. Moreover the Government objected to original cost, but such cost was less than reproduction cost. There was no evidence of comparable sales. The witness Kuehnle only referred to certain sales to obtain information as to what percentage of return a purchaser might require on his investment. In the absence of comparable sales, evidence of the original cost and the reproduction cost as well as the capitalization of rental income is competent in the determination of what is just compensation. See, e. g., Clark v. United States, 8 Cir., 1946, 155 F.2d 157. Capitalization of rents need not be solely adopted. Demetria Sifuentes v. United States, 1 Cir., 1948, 168 F.2d 264, 266. The just compensation should not be determined by selecting any one formula of valuation and pursuing that to the very end. This would inevitably give a wrong result. See United States v. 49,375 Square Feet of Land, Etc., D.C.S.D.N.Y., 1950, 92 F.Supp. 384, 387, affirmed United States v. Tishman Realty Const. Co., 2 Cir., 193 F.2d 180, certiorari denied 343 U.S. 928, 72 S.Ct. 761, 96 L.Ed. 1338. All the elements which go to make up fair cash market value should be considered since such value can only be an informed guess. United States v. Miller, 317 U.S. 369, 374–375, 63 S.Ct. 276, 87 L.Ed. 336. The court, therefore, will discuss these factors which are relevant to just compensation.

### Original Cost

It was stipulated that the cost to Jonathan Woodner Company of the projects, exclusive of builder's and architect's fees, was $8,297,969.23. The projects were completed in March, 1953.

The witness Law testified that there was a stoppage in the work due to lack of financing and he estimated that the stoppage increased the cost about $18,000. He testified that supplies and materials were purchased and subcontracts were let on a competitive bid basis. There was evidence that a standard builder's fee was 8% and architect's fee was 4% after the builder's fee is added. The witness Nathan estimated the original cost at about $8,000,000, exclusive of builder's and architect's fees. This estimate was reached by assuming a construction cost of $9,068,000, exclusive of builder's and architect's fees, on May 1, 1957, as testified to by the witness Duso. Nathan projected back to the date of actual construction. The court finds that the reasonable cost of the two projects was approximately $8,200,000, without builder's and architect's fees.

### Reproduction Cost

The testimony varied on the estimated reproduction cost as of May 1, 1957, including builder's and architect's fees, from $9,168,206 to $10,185,193. The top estimate was given by Duso as an estimate upon which contractors bid to obtain a contract for the construction of a project. He further testified that a bid submitted by a contractor on such projects as here involved would vary 5% to 20% from his estimate. There was evidence that the reproduction cost as of May 1, 1957 would be greater than the original cost. The court finds from all the competent evidence that the reproduction cost, as of May 1, 1957, would be about $9,500,000. In the replacement cost the builder's and architect's fees should be and are included.

### Depreciation

As of May 1, 1957, the buildings were about four years old. All the evidence is to the effect that the property had depreciated. The amount of depreciation varied from Roe's estimate of $350,000 to Dunn's estimate of $916,-000. The estimated remaining useful life of the buildings varied from 35 to

**482**

46 years. Naturally this would affect the amount of the depreciation. Roe confined his estimated depreciation to what he observed. Obviously this would not be an accurate estimate because there are many elements in the physical structure which could not be seen. The court finds that the fair depreciation for the four year period would be approximately $750,000 leaving a net replacement cost of around $8,750,000 as of May 1, 1957.

### Capitalization of Rental Income

The court finds from all the competent evidence that the fair cash market value with a buyer willing to buy and a seller willing to sell varies from Dunn's estimate of $6,673,552.31 to Roe's estimate of $8,685,914. Kuehnle fixes a fair cash market value of $6,755,694.31. The court in arriving at these figures has added the mortgage indebtedness to the values estimated by Dunn and Kuehnle for the defendants' "equity". The court has deducted from Roe's estimate of market value $58,000 which he improperly included for laundry facilities.

The defendants complained that the valuation of their interests subject to the mortgages was unfavorable and improper. Both Dunn and Kuehnle considered that the mortgages at their low interest rate were advantageous to the defendants. The result, therefore, does not harm the defendants whether their interest is valued subject to the mortgages and the mortgages added, or the entire interest is valued free and clear of the mortgage indebtedness.

█ The valuations of Dunn and Kuehnle gave no credit for payment of the mortgage principal. They subtracted the payments on the principal from net rental income and capitalized the resulting amount. Amortization of mortgage indebtedness is not an expense item, and to treat it as such would improperly reduce the valuation. See De-Luz Homes v. County of San Diego, 1955, 45 Cal.2d 546, 290 P.2d 544. Also, Dunn on cross-examination stated he gave no consideration to the existence of a hypothetical willing seller, stating that the capitalization method of determining market value only requires the existence of a willing purchaser.

On the other hand, Roe in reaching his estimated fair cash market value based estimated gross rentals largely on the higher rents charged for housing off the base and did not give sufficient weight to the provisions of the leases requiring Air Force consent for rental increases. He testified that his gross rentals were reasonable. However, he only considered reasonableness from the standpoint of the two corporations and not from the standpoint of a major purpose of these projects, namely, to provide reasonable rentals to Air Force personnel. At one point in his testimony he said that he would reduce his estimated value if, in fact, the terms of the lease did control the rentals. In giving controlling importance to off-base rentals, Roe gave inadequate consideration to the fact that off-base housing would likely be constructed on land owned in fee which would have required an additional investment and would have been subject to all local taxes.

The capitalization of net rents to determine value would vary materially according to the multiplier to be used upon the determined net rentals. The applicable multiplier varied from Roe's 14.5354 to Dunn's 6.8. The court taking into consideration an estimated net rental and multiplier which would satisfy both a willing buyer and a willing seller finds that based upon the capitalization of rent the value of the premises is about $6,950,000.

The defendants offered no evidence to prove that any value inhered to the remaining term of the 75 year leaseholds after the termination of the useful life of the buildings. The defendants would be liable for payment of ground rental, but under the terms of the lease it is doubtful that the buildings would be reproduced.

█ The court therefore finds, based upon the competent evidence and the

view of the premises, that the defendants as owners of the leasehold interests are entitled to just compensation as of May 1, 1957, in the amount of $7,100,-000. On distribution the amount due on the indebtedness secured by the mortgages and the Air Force loan must be deducted in accordance with the stipulated amounts due.

The Government and the defendants have submitted suggested findings of fact. The court in this opinion has made sufficient findings of fact and conclusions of law and these may stand in lieu of separate findings. Those findings of fact requested which are not included are deemed unnecessary as ultimate findings of fact.

Order may be submitted in accordance herewith.