UNITED STATES of America,
Plaintiff-Appellant,

v.

190.71 ACRES OF LAND IN LAKE COUNTY, ILLINOIS, Corbetta-Price Company, Inc., et al., Defendants-Appellees.

No. 13315.

United States Court of Appeals
Seventh Circuit.

Feb. 14, 1962.

See also 176 F.Supp. 603.

James P. O'Brien, U. S. Atty., Chicago, Ill., Ramsey Clark, Asst. Atty. Gen., S. Billingsley Hill, Atty., Lands Div., U. S. Dept. of Justice, Washington, D. C., Luther D. Swanstrom, Asst. U. S. Atty., Chicago, Ill., Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., for appellant.

Frank H. Connelly, New Rochelle, N. Y., Paul E. Flaherty, Chicago, Ill., Robert F. Young, Dayton, Ohio, for appellees.

Before DUFFY, SWYGERT and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

In this condemnation action, the United States has appealed from a judgment entered August 15, 1960, upon a jury verdict rendered June 17, 1960, awarding to defendants $2,509,632, as just compensation for the taking of their leasehold interest in a certain Wherry housing project known as Forrestal Village, at the Great Lakes Naval Training Center in the city of North Chicago, Illinois. The complaint and declaration of taking were filed April 1, 1959.

Corbetta-Price Co., Inc. (hereinafter referred to as the Owner) was the lessee and the United States the lessor of the land in question. Upon the leased land the Owner erected and operated a military rental housing project of 1000 dwelling units. The stockholders of the Owner corporation were Louis P. Corbetta, Roger H. Corbetta, Gayle D. Price and Harry S. Price, Jr. During the trial they were substituted as defendants in place of the Owner corporation.

The housing project covered three contiguous parcels which had been leased by the Government to the Owner under three separate leases. The three projects were actually one, being completely integrated through unified management, common piping and utilities, common services and the like. The leases were not uniform although each was for a period of 75 years. Two were terminable by the Navy after 39 years; the third, after 50¼ years. The ground rent payable under two of the leases was the sum of $1.00 each per annum, while under the third it was $100.00. Under two of the leases title to the buildings remained in the lessee until expiration, while under the third, title passed to the Government upon erection of buildings by the lessee. The differences in the terms of the leases are of no importance in the present case except as to their termination clauses, and even this is of little consequence because the case was tried on the theory that the leases were to be considered as terminable at the end of 50¼ years.

The project was leased, financed and constructed under the terms of the Wherry Act of August 8, 1949, 63 Stat. 570, 12 U.S.C.A. (1952 ed.) § 1748 et seq. After World War II, there was an acute shortage of housing for the families of military personnel at most military installations throughout the country. The purpose of the Act was to afford the Government a program for promoting the construction by private enterprise of low-cost housing. Numerous inducements were offered, the most important of which was for financing by the Federal Housing Authority (FHA) of a major portion of the cost of such construction. The Government controlled rentals, operation, maintenance, rate of return, etc. The maximum amount of a mortgage obtainable upon such projects was 90% of the cost of construction, and the rate of return to the Owner was based thereon.

On August 11, 1955, the Wherry Act was amended by what is referred to as the Capehart Act. 42 U.S.C.A. (1952 ed., Supp. V) § 1594a. Provision was made in this Act for the acquisition of Wherry housing projects in the discretion of the Secretary of Defense. On August 7, 1956, the Capehart Act was amended so as to make such acquisition mandatory. 42 U.S.C.A. (1952 ed., Supp. V) § 1594a(b).

The leases included an area of 191 acres, of which 13 were covered by buildings, 125 by lawns and play areas and 53 by roads, etc. There were 1000 dwelling units contained in 273 buildings. The first buildings erected by the Owner were occupied October 1, 1951, and the last, March 1, 1953. These dwelling units consisted of 68 1-family dwellings, 34 2-family dwellings, 156 4-family dwellings and 15 16-family dwellings. The average monthly rental was $73.40.

The Owner borrowed a total of $8,380,-500 on mortgages with the New York Life Insurance Company and the New York State Retirement Fund, guaranteed by FHA, which matured in 32½ years and required an annual payment on principal and interest of $464,717. There was due annually a mortgage insurance premium of ½ of 1% of the diminishing unpaid principal balance, which averaged about $18,000 per year, making a total of debt service charges of about $483,-000. At the date of taking, April 1, 1959, this mortgage indebtedness had been reduced by $793,198, leaving a balance of $7,587,301.

The general nature of projects leased, financed and constructed under the Wherry Act has been considered and described by numerous courts who have dealt with the evaluation issue in condemnation actions. United States v. Certain Interests in Property in Champaign County, Illinois, 7 Cir., 271 F.2d 379, cert. den. 362 U.S. 974, 80 S.Ct. 1058, 4 L.Ed.2d 1010; United States v. Benning Housing Corp., 5 Cir., 276 F.2d 248; United States v. Leavell & Ponder, Inc., 5 Cir., 286 F.2d 398, cert. den. 366 U.S. 944, 81 S.Ct. 1674, 6 L.Ed.2d 855; Buena Vista Homes, Inc. v. United States, 10 Cir., 281 F.2d 476; United States v. Tampa Bay Garden Apartments, Inc., etc., 5 Cir., 294 F.2d 598, and United States v. Certain Interests in Property, etc., 4 Cir., 296 F.2d 264.

The Government deposited $709,000 as estimated compensation with its declaration of taking filed April 1, 1959. As previously noted, the case was tried to a jury. At the trial, five expert witnesses testified as to the value of the interest taken. The three Government witnesses valued such interest at $500,000, $575,-000 and $725,000; the two Owner's witnesses, at $2,814,000 and $3,000,000. The jury awarded $2,509,632. After denial of the Government's motion for a new trial, the Court entered judgment in the amount of the jury award. It is from this judgment the appeal comes to this Court.

The Government in its brief states:

"This appeal followed because it is believed that an excessive award resulted from several errors of law. In general terms, they erroneously led the jury to return either the owners' investment in the business venture or the income they hoped to receive at the existing rate for 43 years into the future, instead of an award correctly based on fair cash market value."

The errors of law asserted by the Government are embodied in its statement of contested issues, as follows:

"1. Whether, in this proceeding to condemn the interest of the sponsors [Owner] in a Wherry housing project, the district court erroneously abandoned the standard of fair market value as the measure of just compensation under the Fifth Amendment.

"2. Whether the district court erred in admitting in evidence asserted original cost as a measure of valuing the sponsors' [Owner's] interest in a Wherry housing project.

"3. Whether the district court erred in rejecting evidence of the ratio of sales price to income from other Wherry and federal low-cost housing projects on the ground that those projects were not comparable.

"4. Whether the district court erroneously permitted double compensation by allowing the sponsors [Owner] to receive compensation, based on the assumed availability of $233,000 accumulated as a reserve fund for replacing short-lived equipment seven to nine years old at the date of taking, when the sponsors [Owner] had been paid that fund.

"5. Whether the district court erred in permitting consideration of a 'bonus' value due to the low interest rate on the mortgages on this property as a result of the Government's insurance of them.

"6. Whether the district court erred in admitting testimony that a witness had a specific customer who was willing to pay his estimate of value."

We shall discuss these issues in the order stated.

■ The record does not support the Government's contention that the Court abandoned the standard of fair market value as a measure of just compensation. Most of the matters cited by the Government on this point consist of statements made by Owner's counsel in his opening statement to the jury, to which no objection was made and to which Government's counsel had a right to respond, and statements made by counsel and the Court in a colloquy out of the presence of the jury. The matter referred to by the Government falls far short of disclosing that the Court abandoned the fair market value test, particularly in view of the testimony of the expert witnesses for both the Owner and the Government and the instructions which the Court gave to the jury.

■ There was some confusion as to the proof which might be utilized to de-termine market value of a leasehold interest the like of which had never been sold and from its nature could not be sold, but a reading of the numerous opinions in Wherry Act condemnation cases reveals that such confusion is not unusual. Determination of the market value of property for which there is not and never has been a market has plagued the courts on innumerable occasions. As stated in United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336:

"It is usually said that market value is what a willing buyer would pay in cash to a willing seller. Where the property taken, and that in its vicinity, has not in fact been sold within recent times, or in significant amounts, the application of this concept involves, at best, a guess by informed persons."

In Kimball Laundry Co. v. United States, 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765, the Court stated:

"But when the property is of a kind seldom exchanged, it has no 'market price,' and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights."

In United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392, in discussing the constitutional provision as to just compensation in a condemnation proceeding, the Court stated (page 332, 69 S.Ct. page 1090):

"The Court in an endeavor to find working rules that will do substantial justice has adopted practical standards, including that of market value. United States v. Miller, 317 U.S. 369, 374 [63 S.Ct. 276, 280, 87 L.Ed. 336]. But it has refused to make a fetish even of market value, since that may not be the best measure of value in some cases."

In United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, in discussing principles applicable to val-

uation, the Court stated (page 379, 65 S.Ct. page 360):

"In the ordinary case, for want of a better standard, market value, so-called, is the criterion of that value. In some cases this criterion cannot be used either because the interest condemned has no market value or because, in the circumstances, market value furnishes an inappropriate measure of actual value."

We cite these cases, and many others could be cited, not to justify an abandonment of the fair market value test but to show the difficulty, if not impossibility, of its application in a case such as the one before us. This difficulty permits the utilization of other theories bearing upon value and, consequently, justifies the reception of some kinds of evidence which otherwise would not be proper.

The tidbits which the Government selects from a rather voluminous record in support of its argument on this point are insignificant in view of the Court's charge to the jury. The Government in its original brief in this Court makes no reference to the Court's instructions other than to state:

"It is true that market value was referred to frequently during the trial, especially on the Government's side. It is also true that the jury was instructed that an 'owner's loss is generally measured' by the fair market value of the property."

This concession is in order inasmuch as the Court clearly and emphatically instructed the jury in the traditional manner as to the meaning of fair market value and the manner of its determination. After having done this, the Court gave the Government's requested instruction #6:

"Various theories or ways of arriving at or checking market value are advanced in the testimony. None of them is binding on you except in so far as they are in accord with your own observation, human experience and common sense. You will give to them and the testimony relat-
ing thereto or based thereon such weight and consideration as you deem them entitled to. You are entitled to consider and weigh all the facts and all the circumstances that you have heard in the case as to just compensation of the leasehold interests taken, and then by your verdict return the amount which in your estimation is just compensation."

The Government in its motion for new trial, evidently overlooking the fact that instruction #6 was proposed by it, stated:

"The foregoing instruction virtually gives the jury complete license without benefit of legal guidance as to methods of arriving at value which are incompetent as a matter of law, and with no remonstrance whatever as to the ever-present necessity for seeking 'market value.'"

The Government in its reply brief here, relative to this instruction states:

"While we acknowledge the mistake in the motion for a new trial of overlooking the fact that the instruction was submitted by the Government, that circumstance does not change the fact that our contention then and now is that the jury was permitted to believe that it could award something other than market value."

█ If this instruction had been given over the objection of the Government, it might now have something to argue about; however, the citation of authority is unnecessary for the proposition that the Government cannot now take advantage of an erroneous instruction, if such it be, which it proposed.

The Court gave an instruction as to different matters which the jury could take into consideration in the absence of a market for a Wherry leasehold, which concluded:

"* * * you may also consider the original cost and the value of the construction work performed in the erection of the housing project."

The Government objected to this portion of the instruction and now argues it was erroneous. We shall later consider this contention in our discussion relative to original cost.

■ Each instruction proposed by the Government was given, with two exceptions, #12 and #14. Proposed instruction #12 is as follows:

"You are instructed that the evidence of value of other property is not conclusive as to the value of the property sought to be taken in this proceeding, but in connection with the evidence of such property value, you are to consider the location, kind, character, and any other factor pertaining to the similarity of such other property as compared with the property being taken. Also in arriving at your verdict, such evidence of other property must be weighed and considered with the other evidence in this case under the instructions given as a whole."

This instruction, so we think, was properly refused because there was no proof of comparable sales. It will be subsequently referred to in our consideration of the Court's action in rejecting testimony concerning such sales.

■ The Government's refused instruction #14 is as follows:

"You are instructed that you may consider original costs, not as an element of value of the leasehold interest of the defendant, but only for the purpose of showing the original processing for the construction of the project and the rentals and maximum net income as controlled by the documents executed between the defendant corporation and the United States."

We think this instruction was properly refused. In the first place, as shown under a point subsequently discussed, we think original cost was a proper element to be considered in arriving at a fair market value. Secondly, its meaning is doubtful and uncertain. In a colloquy between Court and counsel relative to

this proposal, counsel for the Government stated that it was not easy to explain, that it was sent to him by Washington and that he thought it was sound and would offer it. It appears in the Government's brief here that it was offered so that the jury might calculate the amount of rent which the Owner was entitled to collect. Assuming that the jury might have understood the complicated formula outlined, it would have been useless because the amount of rent which the Owner could charge was set forth in the FHA rent schedules which were in evidence, and there was no dispute as to that amount.

■ The second contested issue is whether the Court erred in admitting evidence of the original cost of constructing the project. There was testimony that the cost of such construction was $10,404,753.14. In its budget or "project analysis," the FHA had estimated that the project would cost $9,545,794. The cost of construction exceeded the FHA estimate by some $859,000. The Owner received from mortgages on the project, as heretofore stated, a total of $8,380,500, upon which $793,198 had been paid. Thus, the Owner's net investment in the property at the time of taking was $2,817,451.

Counsel for the Owner in his opening address to the jury stated, without objection by the Government, that the construction cost was $10,400,000. Two days later, the president of the Owner corporation testified as follows, without objection:

"Q. How much did it cost you to build it? A. The total cost to us to build was $10,405,000."

On the following day, the same witness repeated his testimony as to the original cost of the project and testified in considerable detail as to why the actual cost exceeded the cost estimate made by the FHA. All of this testimony as to original cost was given without objection. It was not until the fourth day of the trial that the Government raised any question as to this line of proof and, even then, the objection did not go

to its competency but to the point that the Owner in proving original cost was limited to $9,545,794, the estimate made by the FHA as a basis for determining the amount which the Owner could borrow on mortgages.

Assuming, contrary to what we think, that any question relative to the admission of this evidence was properly preserved for review, the Government's contention has little, if any, substance. The Government on brief admits "that original construction cost may be relevant to certain limited issues * * * but that it is not admissible as direct evidence of value." Notwithstanding a statement made during the trial by Owner's counsel which might indicate to the contrary, the record clearly reveals that evidence of orginal cost was considered by the Court not as direct proof of value but as a circumstance which the jury was authorized to take into consideration in connection with all the other circumstances in proof in determining a fair cash market value. As heretofore noted, the Court gave an instruction to the effect that the jury in determining the Owner's loss might take into consideration, among other things, "the original cost and value of the construction work performed in the erection of the housing project." Witnesses for the Owner testified that they did not use the original cost approach as a direct measure of value but merely as a cross-check against the higher valuations which they had arrived at through capitalization of income. One of the Government's witnesses testified that he considered original cost for information purposes, whatever that may mean.

The case law is of no benefit to the Government's contention on this issue. United States v. Certain Interests in Property in Champaign County, Illinois, 7 Cir., 165 F.Supp. 474, 481, was tried by Judge Casper Platt, who stated:

"In the absence of comparable sales, evidence of the orginal cost and the reproduction cost as well as the capitalization of rental income is

competent in the determination of what is just compensation."

This Court, affirming, 7 Cir., 271 F.2d 379, 382, stated:

"We have carefully considered the several rulings of the trial court with reference to the evidence and find no prejudicial error."

In United States v. Benning Housing Corporation, 5 Cir., 276 F.2d 248, the Court reversed a judgment in favor of the owner on the basis that evidence of reproduction cost was reversible error. In doing so, the Court stated (page 253 of 276 F.2d):

"This means, of course, that the case must be tried on the basis of comparable sales, capitalization of income and original cost."

The same Court, in United States v. Leavell & Ponder, Inc., 5 Cir., 286 F.2d 398, again reversed an award in a condemnation case. In doing so, the Court stated (page 408 of 286 F.2d):

"Proof of value must be of three kinds: (1) The cost of the project —a single total figure easily testified to before a jury * * *."

The Government suggests that the Court in the two cases lastly cited did not mean "original cost" but estimated cost made by FHA as a base for computing allowable income to the owner. We discern no reason to agree with this suggestion. Original cost, not capable of determination until after construction of the project is completed, and estimated cost, made by the FHA prior to the time construction is commenced, are two separate and distinct items which may be at great variance. There is no reason to believe that the Court, which in two different cases used the term "original cost" meant anything other than what it said.

We conclude that under the posture of the case here there was no prejudicial error in permitting the jury to consider original cost as a circumstance bearing upon fair market value.

■ The third issue relates to comparability. On May 6, 1960, one month

before the commencement of the trial, Judge Igoe heard argument upon the question of admitting into evidence four allegedly comparable sales, three of which were Wherry transactions, viz., Ft. Devens in Massachusetts, Quantico Marine School in Virginia and Barksdale Air Force Base in Louisiana. No evidence was heard but it was conceded by the Government during argument (a) that such sales were not of Wherry leaseholds but of capital stock in Wherry corporations; (b) that such stock sales took place between three and four years prior to the date of taking in this case, and (c) that the cited Wherry projects were each located about a thousand miles from Chicago. The Court offered to hear any testimony which the Government desired to offer in support of its contention of comparability. No such proof was offered and the Court decided that on the record before it proof of such sales would not be admitted.

At the time of the pre-trial conference, it was clearly the position of the Government that it sought to introduce proof relative to sale of the projects mentioned for the purpose of showing the fair market value of the interest taken. At some time during the trial, the Government appears to have abandoned that position and embraced the theory that such proof was admissible to show the ratio of sales price to income from other Wherry projects. Even so, the Government offered no instruction on the latter theory. It did offer its instruction #12, heretofore set forth, which was denied, presumably on the ground that there was no proof of comparability. The point is that the Government even at that late stage of the trial was relying upon proof of the sales of other Wherry projects as direct proof of value, and this even without proof of comparability.

As noted, the Government was invited by the Court time and again to make its offer of proof as to comparability, which it promised to do. In explanation of its failure to do so, the Government on brief states:

"This offer, however, was not subsequently made because all that it would have contained was already before the district court for its consideration and in the record for the appellate court."

It would have been helpful if the Government had cited record support for this statement. We think it is unfounded. True, the record includes a brief, which was submitted to the Court in support of the Government's motion for a new trial, which contains asserted factual statements relative to the issue of comparability. Obviously, this is no aid to the Government here. Of course, it can be determined from the record that all Wherry projects were constructed under the same law; the owners were guaranteed the same advantages and subjected to the same restrictions. It also is shown that there is a great variance in their income-producing capabilities by reason of their location and numerous other factors.

It is clearly shown that the amount of capitalized income depends upon the length of time that the income being capitalized will continue. All of such projects are confronted with the possibility that changes in the art of warfare may make the particular military base obsolete, or less useful than it was, thus bringing about a reduction of personnel or even an abandonment of the base. A Wherry owner, however, when the military demand is insufficient, may take in civilian tenants to fill vacancies. The potential of an owner on this score, of course, depends largely upon the location of the project. Illustrative, there is mentioned in the record a Wherry project about 100 miles from El Paso, Texas, where, if the military installation were abandoned or severely reduced, there would remain as prospective tenants only "jackrabbits and rattlesnakes." Certainly the sale of the owner's interest in such a project would have no relevancy whatever to the value of the owner's interest in the project with which we are now concerned. The illustration used, even though exaggerated, points up in

unmistakable fashion that proof of comparability, particularly as it relates to income-producing capability, must be made before the sale of such a project can be treated as comparable.

The Owner employed a real estate market research analyst who testified in great detail as to the population and rental housing trends in the vicinity of Forrestal Village, as well as to its advantageous income-producing capability, both present and future. A brief résumé of this testimony will suffice. The Great Lakes Naval Station is located in the largest Naval District in the United States and is the only important naval installation on the Great Lakes. Forrestal Village has always been occupied to the extent of more than 99%, with a long waiting list. It is located on Green Bay Road, one-half mile from U.S. Route 41, and one and one-half miles from the Tri-State Tollway. Two railroad stations are within a mile of the Village, and by express highway it is forty-five minutes' driving time from the Chicago Loop. There are 40,000 industrial workers employed within five miles of the Village, 19% of whom would be interested in moving to the Village, as revealed in a sampling test made for the purpose of this case. Rentals on Village accommodations are about 25% below those prevailing in the vicinity. There is a shortage of rental housing, indicated by the presence of 4,000 trailers in the vicinity. It was the opinion of the witness that the existing spread of 25% between the rents at the Village and those elsewhere in Lake County for comparable quarters will increase as time goes on because of constantly increasing building costs. Such costs have increased more than 25% since the Village was built. Based on his survey and available information, the witness gave as his opinion that any vacancies occasioned by military reduction would be quickly absorbed by civilian occupancy.

As noted, the Government at the time of the pre-trial conference promised but failed to offer proof of its alleged comparable sales for the purpose of determining value. In view of the meager showing made by the Government at that time, we have no hesitancy in concluding that the order entered by Judge Igoe excluding proof of such sales was proper. In any event, it was a discretionary matter for the Court, of which there was no abuse. In United States v. Leavell & Ponder, Inc., 5 Cir., 286 F.2d 398, 409, the Court stated:

"It is traditional that the question whether the compared property is truly comparable is for the judge to decide."

The fact that the Government now disclaims any purpose to use its alleged comparable sales to prove value, but only in connection with the capitalization method employed by the witnesses to arrive at the amount of just compensation, perhaps requires some further consideration. In so doing we pass the Owner's contention that in view of Rule 43(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the question was not properly preserved for review because the Government made no offer of proof concerning other projects which it claimed were comparable.

The Government appears to concede that proof of comparability must be made before other sales can be employed for the purpose of determining compensation of the property to be taken. At the same time, it argues that proof of comparability is not necessary in order to employ other sales in determining value by the capitalization method. We think the fallacy of this position is exposed by a statement on brief, as follows:

"In considering the court's rejection in the present case of the 'comparable sales' offered by the Government, it is necessary to keep in mind the fact that the most basic aspect of a Wherry housing project, insofar as its monetary value to anyone is concerned, is its income potential. In translating that income, after expenses, into worth, great care must be taken in selection of the capitalization rate or multiplier to be applied. This is so both because of

its embodiment of an estimate of the degree of risk and because of the immense leverage contained in each fraction of the percent or reciprocal selected. It is a fulcrum which multiplies each dollar many times."

We discern nothing wrong with this statement. Certainly it is essential that the potential income be established and that the proper capitalization rate be applied. These are both dependent, however, upon the degree of risk involved, which is dependent upon many factors peculiar to each project. We have already briefly shown evidence offered in this case by the Owner, from which each factor could be determined by the experts. How mere proof of a sale (if such had been made) of a project, for instance in Virginia, without proof of comparability, would have any bearing either upon the potential income or the capitalization rate to be applied, is not discernible. The risk involved to a prospective purchaser of Forrestal Village might be entirely different from that of a purchaser of some other project. The length of the lease, the expected life of the buildings, the rate of occupancy, the location of the project which is in a large measure determinative of a potential civilian demand for housing in case of a decreased demand by the military, as well as other factors, all bear heavily upon potential income and the capitalization rate. A Wherry project at a military base whose continuance is uncertain, located in a sparsely settled area of the country, might sell for only a few times its annual net income. A purchaser would be without assurance that net income derived from such a project could be expected for longer than a few years. In contrast, a project located in a rapidly growing industrial community might sell for many times the same net income. With knowledge of a broad demand for housing accommodations by civilians, a purchaser would have far less reason to be disturbed by a prospective reduction in the size or even an abandonment of the military base.

The Government on brief, referring to the alleged sales of other Wherry projects, states, "They were offered solely for the ratio of cash flow to sale price." The Government asserts that for this purpose they were comparable and cites in support, United States v. Benning Housing Corp., 5 Cir., 276 F.2d 248, 249, and United States v. Leavell & Ponder, Inc., 5 Cir., 286 F.2d 398, both decisions of the Fifth Circuit. We do not so understand these cases.

In the Benning case, the District Court heard evidence relating to the alleged comparable sales at a special hearing prior to trial and ruled that the sales were sufficiently comparable to warrant their admission. We are not advised what proof the Government made as to comparability. The Government, dissatisfied as to the amount of the verdict, appealed on the primary ground that the trial court erred in admitting evidence offered by the owner as to reproduction cost. The owner, interested in affirming the judgment, raised no question as to the admission of the comparable sales evidence. The Government having induced the Court to commit the error, if such it was, likewise raised no issue as to its admission. The Court reversed the judgment on the primary issue before it, that is, that of reproduction cost, and in doing so stated (page 253 of 276 F.2d):

"This means, of course, that the case must be tried on the basis of comparable sales, capitalization of income and original cost."

Obviously, the Court did not hold that comparable sales were admissible in the absence of proof of comparability.

In the Leavell & Ponder case, the Government also appealed from an award in a condemnation of a Wherry housing project. The Court, in reversing the judgment on other grounds, stated (page 408 of 286 F.2d):

"Proof of value must be of three kinds: * * * (3) proof of comparable sales is made by evidence of the sales price of property 'considered' or 'judged' to be comparable."

Moreover, the same Circuit in the more recent case of United States v. Tampa Bay Garden Apartments, Inc., et al., 4 Cir., 294 F.2d 598, considered the propriety of proof of the sale of other Wherry projects. The matter of just compensation had been referred to commissioners, who denied the Government's request to introduce such proof. The trial court approved this action by the commissioners, which approval was sustained by the Court of Appeals. In the interest of brevity, we quote the headnote (page 599 of 294 F.2d):

"District court, in government's action to condemn leasehold on air force base, properly approved commission's refusal to consider sales of other leaseholds on air base as indicating proper rate of capitalization on ground that they were not comparable."

A similar result was reached in the Fourth Circuit in a case where the Government condemned a Wherry project located at Ft. Bragg, North Carolina. Proof of the sale of other Wherry projects was denied in the District Court. United States v. Certain Interests in Property, etc. et al., D.C., 185 F.Supp. 555, 556. Upon appeal by the Government, the Court of Appeals affirmed, 4 Cir., 296 F.2d 264. As far as can be determined from a reading of this opinion, no question was raised by the Government in that Court but that proof of sales of other Wherry projects was properly excluded.

We hold that there was no error in the Court's rejection of proof of the sales of other Wherry projects in the absence of proof of their comparability.

■ The fourth issue has to do with the replacement reserve fund of approximately $232,000, the purpose of which, as the name implies, was to insure that the Owner would always have money available to replace worn out roofing, floor tiling and scheduled items of equipment as the occasion should arise. Each year the Owner was required to pay into this fund the sum of $42,680, which was held by the mortgagees. The fund was invested in interest-bearing bonds and the income derived therefrom paid to the Owner. Shortly after the commencement of the present action, this fund was returned to the Owner, with the express consent of the Government.

The position of the Government at the trial was that the amount of the jury's verdict should be reduced by subtracting therefrom approximately $116,000, half of the replacement reserve fund. In other words, it conceded that one-half of the fund belonged to the Owner, but claimed that the Government was entitled to the other one-half. It cited and relied upon a provision in the leases, as follows:

"That upon expiration of this lease, or termination subsequent to the termination of the FHA period, one-half of the unexpended balance remaining in such 'Reserve Fund for Replacements' shall be retained by Lessee for its own use and benefit, and the other one-half shall be paid to the Government for its own use and benefit."

Obviously, no "expiration" of the leases was brought about by the condemnation action; neither were they terminated nor cancelled. They were continued in effect and taken over by the Government, subject to the outstanding mortgages which it assumed and agreed to pay.

The Court, apparently with the consent of counsel, instructed the jury:

"In arriving at the amount of your verdict, you are not to deduct the amount of the replacement reserve fund. The court will take care of that matter after you have rendered your verdict."

In its motion for a new trial, the Government changed its position and requested the Court to deduct from the jury award "the amount of the replacement reserve fund to which any hypothetical purchaser would be entitled, and which had been turned over to the defendant." The Court denied the motion and ruled that the Government was not entitled to a reduction in the amount of

the jury award by the amount of the replacement reserve fund, either in whole or in part.

The Government argues here that it is entitled to have the award decreased by the entire amount of the replacement fund, on the theory that it should be utilized to place the property in good (or up-to-date) condition, or as stated in its brief, "the court should have deducted from the award the total of the replacement fund as being a reasonable equivalent of the amount of depreciation."

It is not open to dispute but that the money in the replacement fund was at all times the property of the Owner. The interest on the fund during the years of its accumulation was paid to the Owner and all interested government agencies agreed, after the commencement of the condemnation action, that the fund be paid to the Owner, which was done. It seems odd that the Government would turn over to the Owner $232,000, to which the latter had no right or claim. The idea that the money belonged to the Government appears to have been conceived long after the action was commenced and to have fully matured only after the case had been tried. According to the complaint and the declaration of taking, the Government took nothing except the interest of the Owner in certain described land.

The Government's contention, reduced to its simplest form, seems to be that the jury award of just compensation included the amount of the replacement fund and, without deduction of the latter, the Owner will twice receive its benefit. While there is some confusion in the testimony of the expert witnesses, we think that the record does not support the Government's theory. As the Government admits in its brief, "All witnesses deducted the $42,680 as an annual expense in their capitalization process." The Owner's net income or net cash flow constituted the base on which the capitalization formula operated. Witnesses for the Owner and for the Government, in arriving at this base, deducted from the Owner's gross income all payments which it was obligated to make, including the annual payment of $42,680 to the replacement fund. Thus, the capitalization base was reduced by that amount, and it follows that the capitalization value determined by each witness was decreased accordingly. Each of the expert witnesses through the capitalization process stated the amount of the "fair cash value" or "market value" of the condemned property on the date of condemnation, and no witness made the suggestion that any further subtraction had to be made in order to get "market value."

The Government states on brief, "Nothing was required to be done or paid by appellees as of the date of taking with respect to replacing equipment which was still useful," and "the Government did condemn appellees' property interest and that property interest contained depreciated equipment." The quoted statement is accurate, but it is destructive of the Government's position. What the Government took, as it admits, were 7-year old buildings with depreciated equipment, and it is required to pay as just compensation the market value of the property in its condition at the time of taking. The purpose of the replacement reserve fund was to assure that the Owner would replace property when and if necessary, not to protect a purchaser or taker in making replacements at some future time. The Government concedes that there were no outstanding obligations at the time of taking; in fact, at the trial when the Owner offered proof of the condition of the property, the Government stated, "We haven't made any to-do about the condition of the property."

A Government witness made the statement, "The fund goes with the property when it is sold," in face of the fact that there has never been a sale of a Wherry leasehold. This idea is similar to that advanced by the Government in its motion for a new trial, that any hypothetical purchaser would be entitled to the replacement reserve fund. The sales talk-

ed about so much in this case were all of the capital stock of the Owner corporation. That is the only way, as the Government in its brief admits, that a Wherry leasehold could be transferred. The purchaser of the shares in such a corporation would acquire an equity in all of the corporation assets. This perhaps would include the replacement reserve fund which was the property of the Owner corporation. This is a far cry, however, from the present situation where the Government takes only what it has condemned. As stated in its brief, "The Government pays only for what it takes," and we might add, conversely, that it takes nothing other than that which it pays for.

Again, the case law, such as it is, is not too helpful in disposing of this issue. The Government relies upon Buena Vista Homes, Inc. v. United States, 10 Cir., 281 F.2d 476, and United States v. Leavell & Ponder, Inc., 5 Cir., 286 F.2d 398, 406, cert. den. 366 U.S. 944, 81 S.Ct. 1674, 6 L.Ed.2d 855, while the Owner also relies upon Buena Vista and United States v. Certain Interests in Property, etc., 4 Cir., 296 F.2d 264.

The Court in the Leavell & Ponder case did not consider the issue, much less decide it. It only stated (page 406 of 286 F.2d):

"Some of the witnesses testified that the total income must be reduced by the cash reserves on hand at the time of taking, because they were necessary for replacement of equipment."

In the Fort Bragg case, the District Court in an unpublished opinion stated [1]:

"The Court was of the opinion then, [that is, at the time the commissioners were instructed] and still is, that this amount of money belonged to the owners and was not subject to condemnation in this case and the declaration of taking confirms this conclusion. The Court in-

structed the Commissioners that the reserves which had been built up by the owners to comply with the requirements of the mortgages and which had been paid over to the owners should not be added to nor taken from the amount of the award. The Commissioners in their Report complied with this instruction."

The motion of the Government for reduction in the amount of the award was denied by the District Court. On appeal, the judgment was affirmed, 4 Cir., 296 F.2d 264. Evidently, the Government made no point of the adverse ruling by the District Court; in any event, it was not mentioned in the opinion of the Court of Appeals.

The Buena Vista case, 281 F.2d 476, was decided by the Tenth Circuit on June 15, 1960, about the time the trial of the case before us was concluded, and might reasonably be thought to explain the Government's shift of position. A careful reading of the opinion in that case makes clear that it is of no aid to the Government here. The opinion, though interesting, need not be analyzed in detail. The award was determined by commissioners appointed by the Court. Some witnesses testified that the reserve fund should be deducted from fair market value, and others that it should be added. It was proven that at the time of taking, repairs costing from $75,000 to $100,000 were required to put the property in good condition. The amount of the reserve fund which had been paid to the Owner was $56,667.62. The trial court instructed the commissioners that the award should be made without any regard to the reserve fund, and that it should not be deducted from the value determined by them. While the commissioners reduced their award by an amount substantially the equivalent of the reserve fund, it was because of the Owner's obligation to make replacements needed at the time of taking. The Court of Appeals in affirming

---

1. We do not have this unpublished opinion and our quotation is from the Owner's brief, which is not objected to by the Government and which we assume to be correct.

the judgment stated (page 479 of 281 F.2d):

"Buena Vista is entitled to recover the fair market value of the property. The commission adopted the capitalization of income method for the determination of value. This method of valuation contemplates that the property is in good condition and capable of producing the income to be capitalized. If, in fact, the property is not in good condition, proper allowance must be made for the cost of needed repairs and replacements. The reserve fund was created to establish and accrue a fund from which the cost of repairs and replacements could be paid."

In contrast, the condemned property here was capable of producing the income which was capitalized. All of the witnesses so recognized and the capitalized value was determined on that basis. There is no proof that any repairs or replacements were needed. As heretofore shown, the Government concedes that there was no outstanding obligation on the part of the Owner at the time the property was taken.

We hold that the Court did not err in its refusal to deduct from the jury award the amount of the replacement reserve fund.

■ The fifth issue, concerning the so-called "bonus" value of the property taken, due to the low interest rate which the Owner was obligated to pay, is based upon the admission of certain testimony by Government's witness Pollak, elicited on cross-examination. The mortgages provided for an interest rate of 4%, and the witness acknowledged that the rate at the date of taking would have been 5% or more. Then follows:

"Q. Now, taking into consideration an eight-million dollar loan, to use round numbers, how much of a bonus will you have to pay today to replace a four per cent mortgage with another four per cent mortgage?

"Mr. Donnelly: I object to that on the grounds that it is immaterial."

The objection was overruled and cross-examination continued without further objection, the material portion of which is:

"Q. Isn't it a matter of simple mathematical calculations? Don't you calculate an eight-million dollar mortgage at four per cent is worth approximately $600,000 more than an eight-million dollar mortgage at five per cent?

"A. That is the reason that we bought these projects, if I may say so, because they had the four per cent mortgage on them.

"Q. Do you disagree with my suggestion?

"A. No. I think that you are correct. I would say that you are correct, that having the smaller interest rate on the property would make us willing to pay more for it."

The Government argues that this evidence was incompetent and must or might have had a prejudicial effect on the jury. It is to be noted that no objection was made on the basis of its incompetency but only the general objection of immateriality. This Court has held that such an objection is not sufficient to preserve for review the issue as to competency. United States v. DeLucia, 7 Cir., 256 F.2d 487, 491. Even so, we have considered the issue and, in view of the state of the record, conclude that the Government's contention is without merit. The Government argues, "there is no transferable value in the fact that they [Owner] had the low-interest mortgage." The Government continues:

"A purchaser from a sponsor would receive no financial advantage in buying a Wherry project with a 4% mortgage at a time when 5% was the prevailing interest rate. Just as with the selling sponsor, the buyer's allowable return would be the fixed percentage of FHA's estimated original replacement cost of the property."

Classroom economics are not required to refute this argument; the Main Street variety will suffice. It is true, of course, that the rent schedule is determined by the FHA and the gross income of the purchaser would be no different from that of the Owner, irrespective of the interest rate. However, the net income, the base upon which the capitalized income is determined, would be affected by the interest rate. In other words, a lower interest rate would result in a larger annual net income and, consequently, a larger capitalized income. We think it inescapable that this feature would add to the Owner's value and would be attractive to a prospective purchaser. As the Government's expert witness stated, "having the smaller interest rate on the property would make us willing to pay more for it."

The Government in its reply brief for the first time suggests that the favorable interest rate "was inevitably taken into account in the capitalization of income process, both in fixing the capitalization rate and in estimating future income." No such suggestion was made to the trial court and we think it too late to advance it here.

The sixth and final issue is based upon the contention that the Court erred in admitting testimony that a witness had a specific customer who was willing to pay his estimate of value. The witness was one of the Owner's experts who, after testifying at length on the issue of value, fixed the amount at $2,800,000. On cross-examination, he was asked by Government counsel if he would advise a customer of his to pay that much for the equity, to which he responded in the affirmative. On redirect examination, the witness was asked by Owner's counsel if he had a customer who would pay $2,800,000. There was neither response nor objection to the question. Thereupon, Government's counsel asked:

"Did you have a customer who was willing to pay $2,800,000 for this leasehold?"

The witness responded:

"I said that under certain conditions which I am willing to describe, I am sure that I could sell this property to a given customer."

Owner's counsel inquired, "What are the conditions?" to which the witness responded in substance that there be no condemnation threat and that certain Government officials approve his customer as a purchaser of the whole lease, not just the stock. The witness concluded, "Given those two restrictions, I could sell it to him." The Government for the first time objected, on the ground that "it sounds like an offer," and "Now he says that he has a customer that he can sell it to. Submit that this is error." The Court overruled the objection with a statement, "You brought this on." Afterward, counsel for the Owner inquired, "Who is your purchaser?" and the witness responded, "The Lurie Company of California." A motion to strike the answer was overruled.

The Government cites cases in support of the proposition that testimony in an eminent domain case of an "offer" to buy property constitutes error. Such cases, on the record before us, are of no benefit to the Government. It was the Government who developed on cross-examination that the witness would advise a customer to pay $2,800,000 for the Owner's interest, and it was also the Government who elicited the answer that he had a customer who was willing to pay that amount. In view of these answers, made in response to Government questions on cross-examination, we discern nothing improper in permitting Owner's counsel on redirect to inquire of the witness as to who the purchaser was. We agree with the trial court in its statement to Government counsel, "You brought this on." The Government is in no position to complain of a situation for which it was in large part responsible.

As heretofore noted, a case of this character is susceptible of much confusion and uncertainty. We doubt if there ever has or ever will be such a case tried

which does not leave something to be desired. We are convinced, however, from a careful study of the record, that no prejudicial error was committed and that the trial was as fair as could reasonably be expected. Expert witnesses for both sides, whose qualifications were not in dispute, arrived at valuations which varied widely. The award by the jury was well within the range of that testimony. Other than that for which the Government was responsible, there is no serious complaint relative to the law contained in the Court's instructions to the jury. There is no basis for the view that the verdict as to value of the property taken is not supported by substantial evidence. Such being the situation, the verdict is binding here.

The judgment is

Affirmed.