**UNITED STATES of America,**
**Plaintiff,**

**v.**

**CERTAIN INTERESTS IN PROPERTY SITUATE IN ADAMS COUNTY, STATE OF COLORADO, and Fitzsimons Gardens, Inc., a corporation, et al., Defendants.**

**Civ. A. No. 7812.**

United States District Court
D. Colorado.
Jan. 25, 1965.

Edward Mulhall, Jr., Asst. U. S. Atty. for Dist. of Colorado, and Robert McKee, Atty., Dept. of Justice. Washington, D. C., for plaintiff.

Fred M. Winner and C. Blake Hiester, Jr., Denver, Colo., for defendants.

ARRAJ, Chief Judge.

This is a condemnation suit instituted by the United States to take a military

housing project erected pursuant to the provisions of the "Wherry Act", 12 U.S. C. § 1748. The declaration of taking was filed on December 1, 1962.

The case was originally scheduled to be tried before a jury on plaintiff's demand. Subsequently plaintiff withdrew its jury demand, and requested that the trial be to the Court; Defendant concurred. The Court suggested it be tried to a Commission, which the plaintiff opposed. Therefore, the matter was tried to the Court.

The popular name of the project is Fitzsimons Gardens. It is a multiple family dwelling project consisting of 200 units and is located entirely within the United States Government Reservation in Adams County, Colorado, known as Fitzsimons General Hospital. The units contain one, two or three bedrooms, and they are located in two sections. The enlisted men's section is comprised of nine buildings, containing 100 units, and the officer's section includes twenty buildings, containing the remaining 100 units.

The buildings are one and two story brick on block backup construction. They are substantial in nature, with poured concrete foundations, oak floors on wooden joists, asphalt tab shingles, plaster walls and double-hung windows. Each unit has one bathroom, metal kitchen cabinets, a thirty six inch gas stove, a seven and one half cubic foot refrigerator, an automatic washer, a thirty gallon gas water heater and a forced air gas furnace.

The project was constructed on land leased by the Secretary of the Army to Fitzsimons Gardens, Inc. The lease was dated July 3, 1950, was for a term of seventy five years and provided for an annual rental of $500. The lease was non-cancellable. It further provided that the units be leased to military and civilian personnel designated by the Commanding Officer of Fitzsimons General Hospital.

The project was financed by an FHA mortgage for $1,620,000 dated September 21, 1950. It was payable in consecutive monthly installments over a period of thirty two years and five months, commencing on February 1, 1952. At the date of taking, twenty one years and seven months remained on the mortgage. During the term of the mortgage, project rents were subject to regulation by FHA through negotiation between it and the sponsor. After the mortgage was paid off, the rent schedule was to be regulated by the Commanding Officer of Fitzsimons General Hospital.

Franklin L. Burns, president and major stockholder of Fitzsimons Gardens, Inc., testified that $2,060,000 had been ultimately necessary to construct the project. Exclusive of the mortgage and the builder's fee, this would leave an original investment of approximately $375,000. Documents in evidence, however, do not seem to support these figures. Balance sheet entries show the project buildings valued at about $1,800,-000 and approximately $163,000 being invested in the capital stock of the corporation. This would seem to leave an original investment of about $100,000 less than Burns' estimate. In addition to this original investment, approximately $330,000 of the mortgage principal had been paid off at the time of taking.

Under the FHA financing arrangements, there was a requirement for the funding of a reserve for replacement. The approximately $72,000 in this fund at the time of taking has already been returned to the defendant, and both parties agreed that this was not to be considered by the Court. Furthermore, as the cost necessary to put the property in sound condition due to repairs and functional obsolescence will ultimately be reflected in the Court's final award, the reserve itself will have no direct effect on the award.

The physical construction of the units is good, and up to the time of taking the project had been maintained in reasonably good condition. Fitzsimons General Hospital is a United States Army Hospital, and an installation which seems to be as permanent in nature as any government installation could be. Even

if the size of this country's military establishment is greatly decreased, hospital facilities, such as Fitzsimons, will be essential to provide medical care for its military personnel and its millions of veterans. Therefore, the continued operation of the hospital is not dependent on continued, expanded military operations, and the economic outlook for the units is very favorable.

Furthermore, the property is located adjacent to the metropolitan Denver area, which consists of over one million inhabitants. Since construction of the project, the Denver suburb city of Aurora has expanded eastward beyond the Fitzsimons complex. This expansion into the Fitzsimons area, the relatively low rent schedules for Fitzsimons Gardens, and the fact that rentals are not limited to military personnel tend to insure a high occupancy rate for the project in years to come.

With that background of the facts in this case, the Court comes now to the valuation problem itself. There seem to be three customary valuation approaches in the appraisal science; all of which have been discussed in various Wherry condemnation cases. United States v. 190.71 Acres of Land in Lake County, Ill., 300 F.2d 52 (7th Cir. 1962); United States v. Leavell and Ponder, Inc., 286 F.2d 398 (5th Cir. 1961), Cert. denied, 366 U.S. 944, 81 S.Ct. 1674, 6 L.Ed.2d 855 (1961); United States v. Benning Housing Corp., 276 F.2d 248 (5th Cir. 1960); United States v. Certain Interests in Property in Champaign County, Ill., 165 F.Supp. 474 (E.D.Ill.1958), affirmed in part, reversed in part 271 F.2d 379 (7th Cir. 1959). These are the cost, market and income approaches. As reproduction cost was expressly rejected in the Tenth Circuit Case of Buena Vista Homes, Inc. v. United States, 281 F.2d 476 (10th Cir. 1960), that method was not urged upon the Court in this case.

The position of the parties in this case, though supported by complicated and elaborate expert testimony, is essentially a simple one. Both sides seek to employ capitalization approaches to valuation, but the two specific approaches are diametrically opposed. The Government feels that market data obtained from the sale of other Wherry projects and other "comparable" Government housing projects is pertinent in determining the proper capitalization formula. The defendant rejects the utilization of "comparables" here, claiming that the sales submitted by plaintiff are not comparable sales and denying that market value has any utility in determining the proper value to be placed on this unique property interest because such market value is not reasonably ascertainable. Due to rigid FHA controls placed upon the property, the defendant believes there is no real market, therefore it seeks to employ the Inwood Coefficient, a method of appraisal recognized by the American Institute of Real Estate Appraisers, in its capitalization formula.

A capitalization formula itself is a rather peculiar "creature". It is a method of combining the three variables of rate, time and amount to arrive at a final capitalization figure. This makes it readily apparent that the final figure is of necessity somewhat arbitrary. This discretionary aspect is further illustrated by the fact that defendant's expert and plaintiff's three experts, including Robert C. Hastings and William W. Mollan who have appeared in numerous other Wherry condemnation proceedings, all arrived at varying final figures via significantly different routes.

█ Before analyzing the variables, it would seem appropriate to dispose of a related problem which was heavily argued by the parties. Plaintiff urged that the capitalization should take place after the debt service, and defendant's position was that it should take place before debt service. It seems clear to the Court that either system could be used, and the choice of one system over the other does not seem critical. Rather, it is the choice of the rate and the time factors that is important.

█ Generally, in regard to the variables, the Court must consider the plaintiff's position with respect to using mar-

ket data for their ascertainment. Documents in evidence show certain figures for four Wherry sales and also for four "608" sales, which are also FHA rent controlled projects. Six of these sales were of corporate stock in the project. Such sales would seem to involve other factors, which would render them of little value for comparison purposes. Furthermore, some of these sales were by FHA after foreclosure, a situation quite unlike the one at hand. There was no evidence of any voluntary sale by the owner of a leasehold, which would compare to condemnation of the leasehold interest subject to the mortgage in the present case. Market data of any real probative value was not presented in this case, and indeed would not seem to be available in any Wherry case at this time.

Because the income variable was the one the parties were in the least disagreement over, it would seem the easiest one for the Court to ascertain first. Defendant's expert took the approximate figure of $110,000 from the project analysis to use in his formula. One of the plaintiff's experts went as high as $114,396 before debt service. Ironically, the plaintiff, who is seeking the lowest compensation award, came up with the highest income figure. This serves only to illustrate a fact which both parties essentially agree upon; namely, it is not the income factor which is crucial here, but it is the rate and time factors which are the most important.

Considering the narrow variance between suggested income figures, the Court feels that a figure anywhere in between would be a suitable one. One of the Government's exhibits contains income and expense figures for the last five years of Fitzsimons Gardens' operations. The Court believes that the five year income average of $112,982 shown there would be a proper figure for the income variable.

In adopting this figure, we are not unaware of the plaintiff's contentions concerning the declining income stream and functional obsolescence of the units.

However, it must be noted that during the ten years ending in 1962 with the figure of $116,132, there was no significant decline in the income stream. It is further noted that although some repairs would inevitably have to be made to functionally update the project throughout the years, a sizeable portion of the "captive tenancy" stationed at Fitzsimons Hospital would always be willing to pay this lower controlled rent, despite obtaining something less in the way of modern household conveniences. Service personnel are more times than not quite ready to endure certain present privations in Government housing, so that they might be able to retain a portion of their quarters allowance for something more permanent of their own later on.

The time variable will inevitably take into consideration some of the plaintiff's functional obsolescence contentions. On this point there is a wide disparity between the positions of the parties. Defendant seeks to use the unexpired term of the lease, which is sixty two years and seven months. Plaintiff's experts projected the income stream for periods of fifteen years, twenty eight years and for other varying periods, depending on what figure was used for the all-important capitalization rate. None of plaintiff's projections, however, approached the sixty two year period.

How knowledgeable men, in the same field of endeavor, can come up with two such widely divergent estimates for the economic life of this one piece of property is almost incomprehensible to the Court. Consequently, about all the Court can do is point out some of the fallacies underlying both of the extremes, and adopt a compromise period which it feels would be fair to both parties in that it would consider factors the Court considers pertinent to the valuation problem, and it would make some attempt to balance off some of these underlying fallacies in the expert testimony.

The fifteen year figure seems totally unrealistic to the Court. Using plaintiff's own market approach, fifteen years

hardly seems a fair prediction of what a "willing buyer" would expect in the way of economic life when he was about ready to obligate himself on a mortgage which would run seven years beyond the expiration of that estimated economic life of the property. Although the Court lays no claim to clairvoyant powers with which it can assess the future, it believes that mere logic and an analysis of the factors discussed in this opinion, demand the conclusion that this property has an economic life considerably in excess of fifteen years and also in excess of the twenty two years remaining on the mortgage at the time of taking. To estimate a life of only fifteen years is to, in effect, make the bold prediction that this property would be valueless by the year 1977. Considering the ten year earnings record up through 1962, this is a prediction the Court cannot in good conscience conceive.

By accepting the sixty two year figure, the Court would be predicting that this property would continue to earn income at the rate of $112,982 a year up through the year 2025. This the Court cannot do either. It can, however, say that despite the reserves for depreciation and the "captive tenancy" at the very stable Fitzsimons General Hospital, this property will someday decrease in value. It might happen in any number of ways, ranging from a national disaster taking one day, to increased updating expenses and decreased occupancy, resulting in lowering income for a period of ten, twenty or thirty years. As can readily be seen, the economic life of this property is no more than an "educated guess". Considering all factors in evidence, we believe that forty two years from the date of taking would be a reasonable estimate of the life of this property, and a figure that is fair to both parties.

The capitalization rate represents the focal point of contention in this case. And well it should, for it is probably the most vital factor in any capitalization of income approach, representing the composite of a great many factors. The Court recognizes the general proposition that market data usually provides the underlying basis for a capitalization rate. It substantially discounted plaintiff's evidence of comparable sales because the Wherry project sales testified to were remote in time, and they, together with the "608" sales testified to, were not, for the most part, otherwise comparable. However, it should be made clear that some of plaintiff's market data has been given consideration by the Court in arriving at the final capitalization rate.

It is with some reluctance that we reach the conclusion to apply the Inwood Coefficient, which has found support in other Wherry cases. United States v. Tampa Bay Garden Apartments, Inc., 294 F.2d 598 (5th Cir. 1961); United States v. Certain Interests in Property in Cascade County, Mont., 205 F.Supp. 745 (D. C.Mont.1962); United States v. Certain Interests in Property in Cumberland County, etc., 185 F.Supp. 555 (D.C.E.D. N.C.1960), affirmed 296 F.2d 264 (4th Cir. 1961).

Accurate market data, rather than an abstract mathematical formula for determining the present worth of future anticipated revenue, would seem the better way to determine the value of the leasehold interest. However, no satisfactory market data of comparables has been furnished this Court. "Determination of the market value of property for which there is not and never has been a market has plagued the courts on innumerable occasions". United States v. 190.71 Acres of Land in Lake County, Ill., Supra, 300 F.2d at p. 55. Plaintiff's experts have presented somewhat conflicting theories, and in their zeal to support figures which fall well below the amount paid into the registry of the Court at the time of taking, they have arrived at some conclusions unfathomable to this Court. In applying the Inwood Coefficient, the Court does not mean to imply that it is the only valid method of Wherry valuation, but confines its application to the state of the specific evidence before it.

Plaintiff has objected heatedly to even the admission of Inwood evidence. One

of the most serious of these objections is that the Inwood factor can be applied only to a level income stream. The Court believes that the income figures to which it is applied need only be capable of being averaged to a level. In adopting the five year income average of $112,982, the Court has presumed this to be the product of a reasonable and continuing balance between obsolesence and depreciation on the one hand and appreciation and stable tenancy on the other hand.

Having decided to adopt the Inwood Coefficient, it remains only to affix the appropriate rate factor. Defendant's expert obtained a rate of 5.45% from a study of 116 Wherry project analyses. It was his opinion that from a study of these analyses, he could ascertain the interest rate that had been necessary to attract builders to the projects. He felt the necessary rate of return for Fitzsimons Gardens would be between 5.25 and 5.45%. He chose the higher of these rates, which when put into the capitalization formula brings a lower ultimate value to the property.

While none of the plaintiff's experts felt that the method was appropriate, there was acknowledgment that it could be used as a check on market approaches; and, in fact it was so used by plaintiff's expert Hastings in an appraisal he had made of a housing project at Lowry Air Force Base, Colorado, in 1958. This same expert voiced an opinion that 5.75–6% would be an acceptable rate in applying the Inwood Coefficient.

The Court is somewhat in agreement with that range, and it finds that 5.75% would be a rate fair to both parties. In choosing this higher rate, which will ultimately give a lower valuation than that suggested by defendant, we have tried to allow for certain market considerations without adopting in entirety any one of the "package" theories of the plaintiff's three experts. This seems to be the fair and proper way to arrive at the "just" compensation, which 40 U.S.C. § 258a requires the United States to pay in a condemnation action.

By taking the remaining economic life of forty two years and the selected capitalization rate of 5.75%, which the Court considers fair and within the range of estimates by the experts, the Inwood factor of 15.743 is obtained. Multiplying this figure by the average income figure of $112,982, we arrive at the valuation of $1,778,676 for the total interest. Subtracting the $1,291,172 remaining on the mortgage at the time of taking, we arrive at the final valuation figure. Therefore, defendant, as owner of the leasehold interest herein, is entitled to just compensation as of December 1, 1962 in the total sum of $487,504.

Let judgment be entered accordingly.

This memorandum opinion will constitute this Court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.