UNITED STATES of America,
Plaintiff,

v.

34.09 ACRES OF LAND, MORE OR LESS, IN the CITY OF NORFOLK, STATE OF VIRGINIA; Allen Apartments Corporation, a Maryland Corporation, et al., Defendants.

Misc. No. 4036.

United States District Court
E. D. Virginia,
Norfolk Division.

March 22, 1968.

Robert M. McKee and Marcus L. Beckner, Jr., Lands Division, U. S. Department of Justice, Washington, D. C., for plaintiff.

Breeden, Howard & MacMillan (Robert R. MacMillan) Norfolk, Va., and Raymond R. Dickey, Washington, D. C., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

On August 31, 1962, the United States of America filed a complaint and declaration of taking of the subject property consisting of a leasehold interest held by Allen Apartments Corporation, the owner and operator of a 400-dwelling unit Wherry housing project, subject to the existing mortgage thereon. The project is located on 34.09 acres of land owned by the United States and adjacent to the Naval Operating Base, Norfolk, Virginia. It is conveniently situated in close proximity to the working area at the Naval Operating Base and Naval Air Station. The improvements consist of 29 one-story and 30 two-story buildings, having a total of 400 housing units, made up of 80 one-bedroom units, 240 two-bedrom units, and 80 three-bedroom units, or a total of 1,600 rooms. The apartments may generally be characterized as typical low-cost F.H.A. construction.

It would unduly prolong this memorandum to relate the history and purposes of the Wherry Act, all of which is reported in prior decisions involving condemnation cases where Wherry Act projects have been acquired, initially by discretionary acquisition under the original Capehart Act, and later made mandatory under the 1956 amendments, 42 U.S.C., section 1594(b). Suffice it to say, a lease was entered into between the Secretary of the Navy, representing the United States, and Allen Apartments Corporation, on June 27, 1952. The lease was for a period of 75 years, with a cancellation clause at the option of the United States at the end of $50\frac{1}{4}$ years— thus leaving slightly in excess of 40

years to run from the date of taking. The lease provided, among other things:

(1) For the payment of a nominal rental of $100 per annum for the leased premises;

(2) The housing would be financed with an F.H.A. insured mortgage under Title VIII of the National Housing Act, 12 U.S.C., section 1748 et seq.;

(3) Military and civilian personnel would have a priority in occupancy but, if not so occupied, the units could be rented to persons other than military and civilian personnel;

(4) If, at any time, there was no mortgage on the leasehold interest, insured by F.H.A., rental rates to be charged would be subject to agreement between the contracting officer and the lessee; and

(5) The buildings and other improvements erected by the lessee became completed real estate, a part of the leased premises and the property of the United States.

On July 1, 1952, the corporation executed a note and mortgage in the amount of $2,412,700. These documents provided for fixed monthly payments of principal and interest, plus mortgage insurance on the declining balance, witn the right of prepayment as to principal in amounts not exceeding 15% per annum of the original principal, and with a premium of 3% less ⅛ of 1% for each year elapsed as to any excess. Requirement was made for adjusted mortgage insurance premium charges in the event of prepayment. Agreeing with the Government, these premiums for prepayment, together with other reasons hereinafter stated, constituted an impediment to any prospective refinancing of the project.

At the time of taking, the balance due on the mortgage was $2,038,553. The mortgage payments were apparently current. Thus the principal of the mortgage had been reduced by the sum of $374,147 as of the date of taking, at which time

the Government assumed the obligation under the mortgage.

Apparently the total cost of the project was $2,867,000.[1] The application for F.H.A. insurance made on April 14, 1952, included (1) a statement of the average monthly rental per unit, (2) the gross rental income, (3) the net income available for debt service, including the amount necessary to amortize the mortgage, and (4) the net income available for dividends, corporate and income taxes, and surplus. The application reflects a cash equity of $103,300, and an equity representing building and architect's fees in the approximate sum of $320,000.

The project analysis, submitted on some date following the application for F.H.A. insurance, reflects the net operating income (including the amount available for debt service) to be $165,281. While gross rentals may be changed from time-to-time by agreement, the debt service obligations could not be altered after the completion of the project and the issuance of insurance of the F.H.A. mortgage.

The level annual installments of principal and interest on the mortgage were $132,698.52. The mortgage insurance premiums, in the amount of ½ of 1% of the declining principal balance, brought about a slight variance in the monthly payments.

The common stockholders of Allen Apartments Corporation were members of the families of Benjamin and Herman Cohen. These family interests, as of the date of trial, owned an additional 429 rental housing units in the Norfolk area, as well as approximately 3,000 units on the east coast. Under the provisions of the Wherry Act, the Commissioner of the Federal Housing Administration became the owner of the preferred stock, making the rent schedule and rental increases being subject to his approval.

The location of the project was an excellent site for a low-cost housing proj-

1. Figure taken from brief of United States. However, the original cost is of no consequence and was not mentioned by any witness.

ect. There is no indication that it would not continue to be a good location by reason of its proximity to the Naval Operating Base and Naval Air Station. If walking is permitted in this day and time, it would be no great effort for workers at these establishments to walk to and from their work. There are other industries within the nearby area where employees could readily be persuaded to rent units in Allen Apartments, if the military and civilian personnel proved to be insufficient. Indeed, witnesses are in substantial agreement that the project would only average a 3% vacancy, despite the fact that the vacancy rate for 1960, 1961 and 1962 had exceeded this figure.[2]

On December 31, 1962—four months after the taking—the Court visited the project at the request of (and in company with) counsel in the case. Admittedly the exterior painting of the wood trim, gutters and downspouts had been allowed to "go by the board." This was due to the fact that a Navy appraiser and owner's appraiser had suggested to the owner that no painting be done as the Navy planned to modernize the project by making the apartments larger. The Court visited several typical apartment units and drove around the entire project. There were many vacant apartments as the Navy had left the same empty as each family moved out, all in anticipation of its rehabilitation plans. At best, vacant apartments are not attractive to the eye, but the Court likewise visited one occupied apartment and observed others in the same category by looking through the windows. In short, the interior of the units, while in some need of painting and a few miscellaneous repairs, was not nearly as bad as described by Government witnesses, and not as good as indicated by condemnee's witnesses—a situation that is not uncommon in the trial of any case.

■■■ By the fair market value of property taken is meant what the property would sell for in cash, or terms equivalent to cash, when offered for sale by one who is willing but is not obliged to sell, to one who desires but is not obliged to buy. Riley v. District of Columbia Redevelop. Land Agency, 100 U.S. App.D.C. 360, 246 F.2d 641 (1957). Market value, fairly determined, should be measured in various ways, depending on the circumstances of each case, and no general formula should be used for the purpose, but the court should retain the concept of market value as a practical standard. United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336; United States v. Certain Interests In Property, 271 F.2d 379 (7 Cir., 1959). Assumptions must be used which makes it unlikely that the appraisal will reflect the true value with nicety. Just compensation should not be determined by selecting any one formula of valuation and pursuing that to the very end as this would inevitably give an erroneous result. United States v. 49,375 Square Feet of Land, 92 F.Supp. 384, 387 (S.D. N.Y., 1950), affirmed on opinion of trial court, sub nom., United States v. Tishman Realty & Construction Company, 193 F.2d 180 (2 Cir., 1952). It is well settled that the award in a condemnation case cannot be made by mechanical or mathematical processes, nor can the process of adjudication be governed by a fixed formula. United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); United States v. Whitehurst, 337 F.2d 765 (4 Cir., 1964). And while the testimony of experts is undoubtedly of value, the trier of fact is not bound to follow the expert. Sartor v. Arkansas Natural Gas Corporation, 321

2. For 1959 and years prior thereto, the vacancy rate was *de minimis*, probably around 1%. For the fiscal year ending 1960, the vacancy was approximately 4%. The following year it jumped to 10%. For the fiscal year ending March 31, 1962, the vacancy rate had reduced to 7% or 8%. For the months of April, May, June and July 1962, it had further reduced to 5%. This apparently was the trend in all housing in the Norfolk area. In July 1962, according to a published Military Housing Report, it was said that there were 9,100 housing units needed for enlisted personnel in the Norfolk area.

U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944); United States v. Honolulu Plantation Co., 182 F.2d 172 (9 Cir., 1950). Stated otherwise, opinion evidence is not evidence of fact. Iriarte v. United States, 157 F.2d 105, 167 A.L.R. 494 (1 Cir., 1946). These fundamental principles must be considered in weighing the evidence of experts testifying in this prolonged nonjury trial.

The parties are in agreement that the familiar formula of reproduction cost less depreciation is not applicable to this case. No effort has been made to raise this issue.

Condemnee's witness, Rountrey, presented a hypothetical refinancing of the mortgage as one means to arrive at fair market value. Assuming, at the time of taking, that the mortgage rate was 5¾% (including mortgage insurance), no purchaser in his right mind would attempt to refinance where the existing mortgage carried a rate of 4½% (including mortgage insurance). Agreeing with Rountrey that the seller and mortgagee might profit thereby, the Court cannot accept the assumption that a buyer would enter into such a proposition. Moreover, as previously noted, prepayment provisions in the mortgage afforded an impediment to refinancing. Nothing further will be said relative to this theory of arriving at fair market value. Furthermore, the witness gave very little weight to this method of valuation.

■■ The allowable average monthly rental per family unit was $57.50 or, with 400 units, $23,000 per month, or $276,000 per annum. With minor variations—perhaps errors of the reporter—this figure of $276,000 gross rental per annum is accepted by all witnesses. Deducting a 3% vacancy allowance amounting to $8,280, leaves an adjusted gross rental of $267,720. Three witnesses, Williamson for the condemnee and Grice and Hastings for the Government, added extra income in the amounts of $4,900, $2,100, and $2,782, respectively. A portion of this supplemental income is derived from washing machines, telephone coin boxes, services to tenants, furniture rental, and forfeiture of deposits, all of which may properly be considered in the overall capitalization. However, the major portion attributed by Williamson is derived from interest on bonds acquired in exchange for amounts deposited by the owner with the mortgagee in the replacement reserve fund, with the interest being paid to the owner. The condemnee was required to pay $16,267 per annum into this fund. Following the taking, the accrued balance in the reserve replacement fund in the sum of $142,336.90 was paid in full to the condemnee. This was in accord with Buena Vista Homes, Inc. v. United States, 281 F.2d 476 (10 Cir., 1960), and United States v. 190.71 Acres of Land in Lake County, Ill., 300 F.2d 52 (7 Cir., 1962). While we acknowledge that the very use of the capitalization-of-income method of valuation assumes the valuation of the property as a going concern, United States v. Certain Interests in Property, 296 F.2d 264 (4 Cir., 1961), we must disregard the item of interest on bonds as this fund was not acquired and, furthermore, any such interest item would be too speculative and dependent upon necessary withdrawals for replacements, as well as a buildup of the reserve account already depleted.[3]

Allowing $2,280 for supplemental income, the Court finds the adjusted gross annual rental to be $270,000.

■ In any capitalization method of value, it next becomes necessary to arrive at the effective net income by deducting from the adjusted gross rental the necessary operating expenses and maintenance, including the annual payment into the reserve replacement ac-

---

3. At the insistence of the Government, the Court permitted interrogation relative to the reserve fund for the limited purpose of showing that a prospective purchaser might view with suspicion a purchase of an equity where there is no reserve fund available. United States v. 190.-71 Acres of Land in Lake County, Illinois, 300 F.2d 52 (7 Cir., 1962).

count. As may be anticipated, the expense estimates vary as follows:

Rountrey (for condemnee) $ 83,267
Williamson (for condemnee) 95,620
Hogan (for Government) 100,065
Grice (for Government) 97,774
Hastings (for Government) 101,581

There appears to be a more-or-less definite ratio between gross rentals and the cost of maintenance and operation (expenses before debt service), same varying between 30% and 35%. Acknowledging that certain nonrecurring items of expense will frequently occur and are paid from operations, the Court stabilizes the expenses at $96,000 per annum. This leaves $174,000 as the effective net income.

At this point the experts part company. The Government experts insist that the only way to arrive at the fair market value is to capitalize the cash flow, due largely to the size of the mortgage. On the other hand the condemnee urges that the recognized method of capitalization rests in the capitalization of effective net income by applying a multiplier to same, thereby arriving at the total value of the property without consideration of the amount of the mortgage and, after determining the total value, deducting the balance due on the outstanding mortgage and any amount estimated for deferred maintenance—the latter being an issue in this case.

An examination of the many authorities [4] involving Wherry Act condemnation cases discloses only one discussion of cash flow. In United States v. 190.71 Acres of Land in Lake County, Ill., supra, mention is made of the Government's brief when, referring to sales which were not deemed comparable, the brief states, "They were offered solely for the ratio of cash flow to sale price." Thereafter, in discussing the deduction of the annual reserve replacement payment as an expense in the capitalization process, the Seventh Circuit said, "The Owner's net income or *net cash flow* constituted the base on which the capitalization formula operated." Manifestly, it is not clear from the foregoing language exactly what was meant. Effective net income is certainly not the same as net cash flow. Since this 1962 decision it is apparent that some appraisers are taking a fresh look at capitalization methods of valuation. One expert indicated that capitalization of net cash flow had been the subject of a symposium in the spring of 1962 and on another occasion a year prior thereto.

While the Court is of the opinion that evidence of the cash flow may properly be considered as *one factor* in the capitalization approach, we agree wholeheartedly with the condemnee that such a method, standing alone, is a far cry from arriving at fair market value. All Government witnesses who were questioned on the subject [5] freely acknowledged that they had not read in any publication or authoritative work of the cash-flow technique of appraising; that all textbooks and manuals stated the property should be appraised as free and clear; one witness conceded that the Appraisal Institute textbook referred to the capitalization of cash-flow method of appraising as being erroneous and could not yield

4. United States v. Certain Interests in Property, 271 F.2d 379 (7 Cir., 1959), affirming 165 F.Supp. 474; United States v. Certain Interests in Property, 296 F.2d 264 (4 Cir., 1961), affirming 185 F.Supp. 555; United States v. Benning Housing Corporation, 276 F.2d 248 (5 Cir., 1960); Buena Vista Homes, Inc. v. United States, 281 F.2d 476 (10 Cir., 1960); United States v. 190.71 Acres of Land in Lake County, Ill., 300 F.2d 52 (7 Cir., 1962); United States v. Tampa Bay Garden Apartments, Inc., 294 F.2d 598 (5 Cir., 1961); United States v.

Leavell & Ponder, Inc., 286 F.2d 398 (5 Cir., 1961), cert. den. 366 U.S. 944, 81 S.Ct. 1674, 6 L.Ed.2d 855; United States v. Johnson, 285 F.2d 35 (9 Cir., 1961). The evidence discloses that at least two of the Government witnesses testified in other Wherry Act cases using the capitalization of effective net income approach, and without regard to the so-called cash-flow capitalization.

5. E. E. Falk; Hunter A. Hogan, Jr.; William W. Mollan; Robert C. Hastings.

value; finally, Hastings admitted that, when he started testifying in Wherry Act cases, he found cash-flow projections in an accountant's text, and that multipliers of cash flow had frequently been used by accountants to determine price-earnings ratios. Indeed, it may be safely said that Hastings has adopted the accountant's viewpoint of value, and has disregarded the appraiser's theory as, he says, the latter do not understand the complexities of taxation. Hastings further agreed that the quotation from *The Appraisal of Real Estate* was correct, so far as it went, where it said:

> "The appraiser values the entire property and disregards financing. Interest is a charge against borrowing. Amortization is a return of a loan by installments."

The theory purportedly justifying the capitalization of cash flow as an approach to fair market value lies in the assumption that an investor in this type of project is looking for a quick turnover on his money without great risk, whereas capitalization of effective net income presupposes a long-term investment. At the outset it should be noted that an examination of the opinions in Wherry Act condemnation cases reveals that, with one possible exception,[6] the balances due on the respective "high level" mortgages were relatively comparable to the existing situation. Secondly, it is not every purchaser who seeks a rapid turnover on his investment and, as indicated by the Seventh Circuit in United States v. 190.-71 Acres of Land in Lake County, Ill., supra,—the same case previously mentioned which refers to the words "net cash flow" in rather ambiguous terms— the low interest mortgage constituted a "bonus" value of the property taken.[7] In answer to the Government's argument that the buyer's allowable return would be the fixed percentage of F.H.A.'s estimated original replacement cost of the property, the Seventh Circuit said:

> "Classroom economics are not required to refute this argument; the Main Street variety will suffice. It is true, of course, that the rent schedule is determined by the FHA and the gross income of the purchaser would be no different from that of the Owner, irrespective of the interest rate. However, *the net income, the base upon which the capitalized income is determined,* would be affected by the interest rate. In other words, a lower interest rate would result in a larger annual net income and, consequently, a larger capitalized income. We think it inescapable that this feature would add to the Owner's value and would be attractive to a prospective purchaser. As the Government's expert witness stated, 'having the smaller interest rate on the property would make us willing to pay more for it.'

> "The Government in its reply brief for the first time suggests that the favorable interest rate 'was inevitably taken into account in the capitalization of income process, both in fixing the capitalization rate and in estimating future income.' No such suggestion was made to the trial court and we think it too late to advance it here."

The third fallacy in the Government's theory of capitalization of the cash flow lies in the admission that, in determining whether there exists a "high level" or "low level" mortgage loan,[8] it is first necessary to arrive at the value of the

6. United States v. Certain Interests in Property, 271 F.2d 379 (7 Cir., 1959), where the cost of construction was approximately $8,300,00 and the balance due at time of taking (including Air Force loan) was about $6,500,000.

7. The Government's expert, Hastings, agrees that a favorable mortgage rate is a "bonus" value.

8. The theory of the "high level" loan is related to the type of purchaser. According to the Government witnesses, a "high-leverage" buyer is interested only in the cash flow after debt service, having an eye to a quick return on his investment thereby giving a greater leverage in the total investment as against the amount of equity required. In determining the capitalization rate, the Government witnesses feel that the rate is higher where the amount of the mortgage is high. Of course, the higher the rate, the lower the

property as a whole. The Government's experts apparently feel that the capitalization of the cash flow or cash throw-off method of valuation cannot be used unless there is a high loan on the property and, if the mortgage is not high enough, this method of valuation must be disregarded.

Finally, and the crowning blow to the Government's novel theory of arriving at fair market value, is that there could be two structures or projects, identical in every respect, with the same gross rentals, the same adjusted gross rentals, the same deductions for operating and maintenance expenses, the same effective net income, but with varying amounts paid for debt service (and perhaps for varying periods throughout the mortgage). By capitalizing the cash flow or cash throw-off on these two identical properties, vastly different fair market valuations would be the result.[9] The Government even argues that the capitalization of cash flow would be applicable where the leasehold owner substantially amortized the principal of the mortgage by a prepayment.

■ In sum, the Court must reject the capitalization of cash flow as a sole method of arriving at fair market value. Such a method is an obvious disavowal of the concept of fair market value and, stated otherwise, would constitute a deprivation of "just compensation" as guaranteed by the Constitution.

■ In arriving at this conclusion it is not suggested that evidence regarding the cash flow or cash throw-off is inadmissible, or that the same cannot be considered by the trier of fact in determining what a willing purchaser will pay for the subject property. The evidence does support the view that the cash flow is a factor—but only one factor—which purchasers of these low-cost housing projects will take into consideration. Depending upon whether the purchaser is interested in a quick turnover or long-term investment, the importance of this factor attaches. The risk presented is another appropriate inquiry. What is condemned by the Court is the use of a capitalization rate applied to the cash flow as a sole means of determining fair market value.

■ While there is much evidence relating to other sales of Wherry Act projects, and other multi-family housing apartments as well as shopping centers, etc., it cannot be said that there are any *truly* comparable sales for the purpose of arriving at fair market value. In fact, a study of the Wherry Act condemnation cases set forth in footnote 4 leads to the belief that comparable sales as aids in determining fair market value are essentially nonexistent. The sales are generally too remote as to time; they are in wholly different locations; they sometimes involve sales of common stock

---

ultimate value will be on this theory. One Government witness defines a "high level" loan as any loan exceeding 80% of the value. Hastings, another Government witness, referred to "high ratio" long-term mortgage by relating the ratio of the mortage to income and not to value.

9. Condemnee's expert, Williamson, prepared charts showing the analysis of sales as related to capitalization of cash flow and capitalization of effective net income for (1) Audubon Gardens, Colorado Springs, Colorado, (2) University Manor, Charlottesville, Virginia, (3) Rock Creek Gardens, Silver Spring, Maryland, (4) Rego Park Apartments, Brooklyn, New York, (5) Fort Devens Manor, Fort Devens, Massachusetts, (6) Barksdale Field, Shreveport, Louisiana, and (7)

Thomason Park, Prince William County, Quantico, Virginia. Consistency was found in the multiplier applied to effective net income in six of these projects and, in one or two instances, the safety factor was thin. Only in Rego Park Apartments was the capitalization of cash flow reasonably consistent except for one instance. It was explained that Rego Park Apartments was a high-rise apartment building in Brooklyn and, at least to that extent, differed appreciably from the other projects. While it is not suggested that Williamson is absolutely accurate in all of his computations, the trend indicates that any attempted capitalization of cash flow will not bring about any realistic approach to fair market value, either of the entire property or the equity above the existing mortgage.

and not sales of the leasehold interest; they differ in size, income and type of construction. As the Seventh Circuit so aptly said in United States v. 190.71 Acres of Land in Lake County, Ill., supra, in referring to the record in a Wherry project about 100 miles from El Paso, Texas, where, if the military installation were abandoned or severely reduced, there would remain as prospective tenants only "jackrabbits and rattlesnakes." While it is a proper subject of examination and cross-examination to present the overall problem—especially in a nonjury case—the other sales throughout the country furnish little aid in determining the potential income or the capitalization rate to be applied. The length of the lease, the risk involved, the rate of occupancy, the expected life of the buildings, the location of the project, the present and prospective demand for occupancy, the control of rents, the interest rate on the mortgage and terms thereof, the lack of competition, the collectibility of rents, and other factors all go to make up the capitalization rate to be applied. Similarly, in ascertaining the economic life of the project, one must look to the type of construction, provisions for maintenance, protection against abuse by tenants, continuing need and demand, etc. United States v. Certain Interests in Property, 296 F.2d 264 (4 Cir., 1961).

The record reflects that the Government witnesses, Falk, Hogan and Grice, either refrained from stating a capitalization rate to be applied to effective net income, or were otherwise not questioned as to same. Condemnee's witnesses, Rountrey and Williamson, testified as to a capitalization rate on effective net income of 6 to 6½% (Rountrey) and 6.4% (Williamson). The Government witness, Mollan, was not questioned specifically as to Allen Apartments, but computed an overall *rate of return* of 9.3782% on effective net income predicated upon 98.65% occupancy, and 8.-7982% based on 95.5% occupancy.

Finally, the Government witness, Hastings, testified to an overall capitalization rate on effective net income of 7.38% for Allen Apartments, but insisted that the proper method was to capitalize the cash flow and gave a 12% rate to same.

We are not unmindful of the force of the Government's argument urging us to accept the capitalization of cash flow or cash throw-off technique in arriving at fair market value of the leasehold interest acquired, subject to the mortgage. It is contended that only the "equity" is taken from the condemnee; this despite the fact that the declaration of taking and complaint refers to all "right, title and interest of Allen Apartments Corporation, a Maryland corporation, subject to the lien of a deed of trust * * * " [10] This overlooks the fact that had condemnation proceedings not been instituted, the mortgage would have been retired in approximately 24 years. Certainly at that time the condemnee would have possessed a leasehold interest and not a mere equity over and above the mortgage.

■ While the strength of the condemnor's persuasive power lies in the purported knowledge of what a willing buyer will examine prior to investing his money, together with the theory that wealthy men are desirous of investing in several ventures rather than "putting their eggs all in one basket" with the attendant risk, the evidence falls short of establishing that buyers look *only* to the cash flow in ascertaining what price they are willing to pay, either for the physical assets, leasehold interests, or equity or, as frequently occurs, for the common stock of the corporation possessing the leasehold interest. During the course of trial much of the evidence was hearsay in nature with respect to various other properties which, while not strictly comparable, constituted relevant evidence in weighing the experts' approach to value and the theory adopted by each expert. The Court did not suggest any

10. Virginia uses a deed of trust in lieu of a mortgage. We have referred to the word "mortgage" in this opinion as does the evidence. For the purposes of this case, the terms are synonymous.

exclusion of hearsay testimony until the Government injected into the case several purported after-the-sale conversations with buyers or their representatives as to the buyer's state-of-mind in arriving at the price finally paid for the property. Stated otherwise, the Government sought to prove through Hastings what others had said to him as to the basic reasoning behind the purchases of multifamily projects in Thomason Park, Quantico, and Pine Chapel Village, Hampton, viz., that others had told him that they purchased the properties solely on the basis of the cash flow. At no time did the Court reject hearsay testimony as to the price paid, the mortgage details, the settlement facts, the record evidence, etc. Significantly, the two persons to whom Hastings attributed the remarks were residents of areas readily accessible to the Court and, moreover, the Court, after rejecting this type of hearsay testimony and permitting an offer of proof, granted both sides a reasonable time following the conclusion of a nine-day trial within which to elect to take the deposition of the person in question. The two individuals were Abe Pfeffer of Richmond, Virginia, and Frank O. Blechman of Newport News. No effort was made to secure the presence of Pfeffer or to otherwise take his deposition. Blechman, a Newport News attorney, testified on the last day of the trial.

We are aware of the liberal rule permitting exceptions to hearsay testimony in the trial of condemnation cases. As the late Chief Judge Parker said in United States v. 5139.5 Acres of Land, etc., 200 F.2d 659, 662 (4 Cir., 1952):

"The witness within reasonable bounds should have been allowed to give the jury the facts upon which his opinion as to value was based; and it would unduly hamper the production of such testimony and needlessly prolong the trial to require that the sales be proved with the particularity that would be necessary in suits to enforce the contracts relating thereto. The hearsay and best evidence rules are important, but they should not be applied to prevent an expert witness giving in a reasonable way the basis of his opinion.

\* \* \* \* \* \*

"[W]e think the better rule is that where the opinion of an expert witness is based in part on such sales, he should be permitted to give the details of the sales upon which he bases the opinion, although the facts so stated do not become independent evidence.

\* \* \* \* \* \*

"Ordinarily evidence as to facts of this sort given by an expert as the basis of his opinion as to value comes with a sufficient guaranty of trustworthiness to justify the relaxation of the hearsay and best evidence rules."

We find no fault with the foregoing, nor with the statements by other courts in cases cited by the parties. As to Blechman, since he testified the issue is moot. However, as to Pfeffer and the context in which the question was presented, the Court adheres to its prior ruling that such statements by Hastings are inadmissible. At the outset it should be noted that Pfeffer's alleged statement was initially raised in the cross-examination of condemnee's expert, Rountrey, who was well acquainted with Pfeffer and had frequently worked for Pfeffer's boss, Gumenick, who was the purchaser of the Quantico project. Rountrey denied that Pfeffer had told him that Thomason Park was purchased on the basis of so many times the cash flow. When finally asked to assume that Pfeffer had made such a statement, Rountrey said that it would be a lie. It was Hastings who, in an offer of proof, related a conversation with Pfeffer in which Pfeffer allegedly told Hastings and one Slipek [11] that the purchase of

---

11. The Court assumes that the Mr. Slipek referred to is the gentleman who at that time was serving as an Assistant United States Attorney in charge of land con-demnation cases in the Richmond Division of this Court. Mr. Slipek was not called to testify.

Thomason Park was made on the basis of five times the cash flow.

There are several faults to find in this type of hearsay testimony. At the outset it should be noted that the late Chief Judge Parker said that hearsay testimony as related by valuation experts is admissible within "reasonable bounds" and as an aid "in a reasonable way" in giving the basis of opinion. More important, however, is the fact that the statement allegedly made by Pfeffer does not aid the expert in determining value; at best it merely lends support to the theory of capitalization of cash flow as an approved technique in arriving at fair market value. Furthermore, it was injected into the case on cross-examination of Rountrey, one of condemnee's experts, presumably for the purpose of making Rountrey's testimony less credible. Rountrey was so emphatic in denying that Pfeffer ever made such a statement, or even could have made the statement, that to accept the hearsay testimony would effectively lessen Rountrey's credibility.

As noted above, Blechman finally testified as to the purchase of Pine Chapel Village. Contrary to the specific offer of proof, Blechman testified that the project was purchased for a long-term investment; he conceded that the amount of cash flow was a "substantial yardstick" considered by the purchasers, but he declined to say that it was "primary" and further stated that cash flow results cannot ever be the sole yardstick; he likewise indicated that the purchasers of Pine Chapel Village were not concerned only with the succeeding four or five years, but they were also interested in the income after the mortgage was retired.

While the Government would have the Court arrive at a fair market value by adopting the capitalization of cash flow, and disregard all other methods, it is plain from Blechman's testimony that this approach to value was only a factor for consideration. We suspect that if Pfeffer had testified, this is the most

that he would say. Therein lies the danger of accepting after-the-fact hearsay statements as to the state-of-mind of purchasers. It apparently does not have a sufficient guaranty of trustworthiness. The Court adheres to its prior ruling.

We think it inappropriate to detail the conflicts between experts as to other sales. Acknowledging that adjustments in financial statements must be made to give a true picture of effective net income and cash flow, it is singularly strange that condemnor's experts invariably adjusted the projects' expenses for operation and maintenance by decreasing same, thereby making a larger cash flow. It was conceded that these adjustments were based upon statements to F.H.A., and not upon certified operating statements. According to Hastings, certified operating statements do not reflect actual experience. Recognizing, as we must, that adjustments relating to management expense are necessary where the owners frequently withdraw more or less than the customary five percent in a given year, and admitting that an operating statement may disclose some nonrecurring expenses paid from operations in a particular year, we doubt that there is otherwise too much room for adjustment in the operating and maintenance expense accounts of the other projects which resulted in sales. Of course, it was the desire of the Government to increase the cash flow in these other projects in order to substantiate the sale prices, thus negativing any inferences that the purchasers acted on any capitalization of effective net income. Conversely, condemnee's experts were pointing to the effective net income in these other projects and the expert, Williamson, acknowledged that he relied upon the figures contained in the certified operating statements in making any major adjustments. Condemnee's theory has always been that there was no meaningful basis upon which a cash flow capitalization could be established; the Government, by adjusting expenses

downward thereby increasing the cash flow, sought to convince the Court that there was a relation between the *true cash flow and the contract price.*

The adjustments are, of course, fraught with danger and the expense is susceptible to major error. For example, with respect to the Fort Devens project, Hastings used a cash flow of $31,000, rather than $25,000 as shown on the statement. He accomplished this increase in cash flow by decreasing the administration expense back to the allowable percentage as stated in the F.H.A. project analysis. However—and this is where the expert slipped—the actual maintenance item on the operating statement was $7,998.75, whereas the stabilized maintenance expense as set forth in the F.H.A. project analysis was $24,000. What Hastings failed to do was to adjust the maintenance expense upward, thereby reducing the cash flow. In short, he took what was favorable to the Government on the F.H.A. project analysis, and rejected what was unfavorable. Additionally, although the F.H.A. analysis revealed a maximum of $28,000 as a cash throw-off, Hastings used $31,000. He had no explanation for his actions but later, after realizing the obvious error, he contended that he raised the cash flow because of the agent's projection of income—a procedure which would be vigorously objected to by the Government if relied upon by the condemnee to support any valuation urged.

It is difficult to attempt any analysis of effective net income, cash flow, and capitalization rate used by witnesses in discussing these other sales. Rountrey, one of condemnee's experts, said that degrees of consistency could be found in multipliers of effective net income in six of the eight projects[12] where the multipliers ranged from 13 to 15 with an average of 13, which would be the reciprocal of 6% to 6½%.[13] Williamson, another of condemnee's experts,

made the following comments as to other sales:

(1) *Audubon Gardens,* Colorado Springs, Colorado. Effective net income per unit was an average of 6.58%. Cash throw-off per unit was an average of $19.60, or practically nothing. With this thin safety factor, the overall rate of capitalization at time of sale was 6.6%. He pointed out that the average effective net income per unit at Audubon Gardens was $390, whereas Allen Apartments had an average per unit effective net income of $424.50. This project consisted of 168 units, sold in June 1962, at a price of $1,033,160, with a mortgage of $956,553 being assumed, and cash amounting to $76,607 being paid. It had nine years of operation prior to sale.

(2) *University Manor,* Charlottesville, Virginia. With 12 years of operation, the average rate of return on effective net income was 6.6%, but the mean average multiplier for cash flow ran only 2.59%, or a multiplier of approximately 40. He pointed out that no purchaser would have bought on that basis of cash flow and that the sale was made in June 1961 for the sum of $530,000, with cash of $111,116 being paid and a mortgage being assumed in the amount of $418,833. This project consisted of 69 units.

(3) *Rego Park Apartments,* Brooklyn, New York. This is a high-rise apartment consisting of 792 units. Both the cash flow and the effective net income were approximately in line. The per unit effective net income for the years 1952 through 1958 ranged from a high of $573 to a low of $482. The per unit cash flow ranged from a high of $45 to a low of $8, with three years showing losses in cash flow in the amounts of $16, $22 and $50. This project was sold in September 1959 for $6,598,000, subject to a mortgage of $4,889,000 and cash paid in the sum of $1,709,000.

12. Fort Devens, Barksdale Air Force Base, Quantico, University Manor, Rock Creek, and Audubon Gardens.

13. Obviously this would not be an average of 13. Three of the projects disclosed multipliers of 15; two at 14; and one at 13.

(4) *Barksdale Air Force Base*, Shreveport, Louisiana. Unlike Allen Apartments and other projects, the buildings were scattered around the military post. It consists of 692 units and was sold in March 1954 for $5,744,613 with $329,411 being paid in cash and $5,415,202 being in the form of an assumed mortgage. It only had two years of operation prior to sale, with a per unit cash throw-off of $109 for 1952 and $67 for 1953. The effective net income per unit for 1952 was $582 and, for 1953, it was $556.

(5) *Rock Creek Gardens*, Silver Spring, Maryland. Over a period of 10 years' operations this project, consisting of 505 units, displayed a fairly consistent effective net income per unit and on a percentage ratio. Eliminating the first year, the effective net income per unit ranged from a high of $634 to a low of $535. The percentage ratio of effective net income, eliminating the first year, ranged from a high of 7.95% to a low of 6.73%. The cash flow per unit, computed on the same basis, resulted in a high of $106 and a low of $34. The percentage ratio of cash throw-off revealed a high of 6.71% and a low of 2.13%. This project was sold in January 1959 for a price of $4,023,067, with $750,000 in cash and a mortgage assumed in the sum of $3,228,068.

(6) *Fort Devens Manor, Inc.*, Fort Devens, Massachusetts. This project, consisting of 202 units, had only one year of operation before its sale in March 1956 for $1,926,702, represented by $202,000 in cash and an assumed balance on the mortgage amounting to $1,724,702. The percentage ratio of effective net income was 6.82%, and of cash throw-off 12.72%. The effective net income per unit was $651.44, and the cash throw-off per unit was $128.26. The limited operational experience for this project affords no basis for approximations.

(7) *Thomason Park, Inc.*, Quantico, Virginia. With three years of operation, this project was sold in April 1955, with a closing on August 25, 1955, for the sum of $3,851,859, with cash paid amounting to $335,359 and a mortgage balance of $3,516,500 being assumed. In size it approximates Allen Apartments as it has 450 units (Allen has 400 units). However, it should be noted that there were certain assumptions of assets and liabilities, as well as provisions for the outcome of tax litigation in the sum of $65,000, which tend to distort the above figures. Apparently the amount paid for the "equity" more nearly approximated the figure given by Hastings; i. e., $280,877. The three years' experience revealed an average effective net income of $564 per unit, and an average cash flow per unit of $88.67. The percentage cash flow amounted to 25% for 1953, 8.01% for 1954, and 2.66% for 1955. The percentage effective net income was 7.50% for 1953, 6.20% for 1954, and 5.97% for 1955.

As noted above, Hastings adjusted all expenses downward, thereby giving a larger cash flow, in all of the sales except Barksdale Air Force Base which had only two years of operational experience. As to Barksdale, while Hastings used a cash throw-off of $51,700, he conceded that in prior testimony in the Fort Benning case he used $60,000. As to Fort Devens, previously discussed, he testified in the Fort Lee case that the cash flow at Fort Devens was $34,107. These differences are not, as applied to this case, of great consequence, but they do show inconsistency on the part of the witness. As to other sales, Hastings points out:

(1) *Rock Creek Gardens*—Hastings adjusted the rental projection upward because of the condition of the property. He agrees with the amount of the sales price and balance of mortgage assumed, making a total sales price of $4,023,068 (differing from Williamson by $1.00). He stated that the net price paid for the "equity" was $672,998.

(2) *Rego Park Apartments*—There were, in fact, two sales of this property in 1959; one on January 28, 1959; the other on September 10, 1959. The first sale, according to Hastings, involved only the leasehold interest; the second includ-

ed the fee title and an assumption of a second mortgage. The net price for the "equity" on the first sale, after adjustments, was $1,010,097; and on the second sale it was $1,111,344. Hastings fixed the cash flow at $129,000 although, he states, the seller represented same to be $207,968. He also indicated that the sponsor had prepaid the mortgage by $700,000.

(3) *Fort Devens Manor*—Subject to the comments heretofore made as to adjustments, it appears that Hastings adjusted the actual price paid for the "equity" to be $192,174, and this appears to be fairly in line with Williamson's statement, although it differs by approximately $10,000. We believe that Hastings figures are probably correct as to the price paid for the "equity."

(4) *Barksdale Air Force Base*—Hastings testified that in the sale of stock, the assets and liabilities were assumed, and the net price for the "equity" was $220,645. He said that he fixed the cash flow at $51,700, although the buyer, Daniels, had suggested that it was $60,000.

(5) *Thomason Park*—As heretofore suggested, the price paid for the "equity" was $280,877. Hastings said that the accountants for the purchaser showed a cash flow of $59,553, whereas he fixed same at $50,000. This figure of $59,553 is apparently tied in with the hearsay testimony discussed infra.

In sum, turning to Allen Apartments, Hastings fixed a rate of 12% of the cash flow of $30,500 as determined by him, thereby establishing an "equity" value of $255,000. Deducting $125,000 for deferred maintenance, he arrives at a figure of $130,000 as the fair market value of the leasehold condemned.

Hogan, another Government witness, using the capitalization-of-cash-flow method and fixing the cash flow at $31,877, establishes a capitalization rate of 12%, giving a value of $265,642 and,

after deducting $150,000 for deferred maintenance, comes up with a fair market value of the leasehold condemned at $115,642. Hogan suggests that a purchaser would expect to get his money back in 8½ years.

Grice, the third expert on valuation for the Government, establishes an effective net income of $172,046, but proceeds to value the property condemned on the basis of the capitalization of cash flow. After fixing the cash flow at $33,454, he attaches a 12% rate of capitalization with an 8.333 multiplier and, after deducting $100,000 for deferred maintenance, he arrives at a valuation for the condemned interest of $178,772, which he rounded out at $180,000.

Rountrey, the first of condemnee's experts, finding little or no consistency in the cash-flow method, elected to arrive at his value by the customary method of capitalizing the effective net income. He stabilized the effective net income at $184,453 and applied a multiplier of 15, or a capitalization rate of 6½%, arriving at a total value of the property, free and clear of liens, in the sum of $2,766,795. He then deducted the balance due on the mortgage in the sum of $2,038,553, plus deferred maintenance of $30,000, thus establishing his value of condemnee's interest at $698,242.[14] Because of other factors, he raised this fair market value figure to $750,000, apparently again neglecting the item mentioned in footnote 14.

Williamson, the other valuation expert employed by condemnee, stabilized the effective net income at $177,000 and applied a capitalization rate of 6.4%, thereby producing an indicated value of $2,765,625 which, after deducting the balance due on the mortgage and an item of deferred maintenance of $25,000, left an income approach value of $702,072 as to the condemned interest. With some further considerations, not pertinent for

14. Rountrey's figure given as to the value of leasehold was $728,242; the difference between the total value and the balance due on the mortgage. While he mentioned the figure of $30,000 for deferred maintenance; he apparently ignored same in his final computation.

discussion, this witness arrived at a value of $710,000.

On the subject of deferred maintenance, we are confronted with Williamson's low figure of $25,000 and Britt's high figure which is slightly less than $300,000. Britt is a registered architect who was employed by the Navy to survey the premises. He performed his work in the period between November 15, 1962, and December 15, 1962—two and one-half to three and one-half months following the taking. It is unfortunate that the condemnor made no effort to arrange for a joint survey of the premises within a matter of days following the date of taking on August 31, 1962. Such action would have eliminated many of the differences respecting the condition of the premises. The wide variation of amounts necessary to place the project in a proper rentable condition, with allowances for depreciation on stoves, refrigerators and hot water heaters, would have been sharply reduced. This, however, was not done.

While no Government expert on valuation accepted in its entirety the Britt report, they apparently relied upon same in part even though they substantially reduced his figures. They realized, as we all do, that Britt inflated the repairs and replacements to such an extent that no court could ever accept same. While Britt denies it, we strongly suspect that he was originally employed by the Navy to give cost estimates looking to the complete rehabilitation by the Navy; the latter contemplating certain structural changes to make the units larger.

The cross-examination of Britt was revealing to say the least. He apparently had not been furnished with a complete set of contract plans and specifications, and certain addendums and change orders were not considered by him. It soon became apparent that he was endeavoring to establish that the condemnee had failed to construct the project according to plans and specifications. In the final analysis, with one possible exception which remains unexplained, it appears that the project was constructed strictly in accordance with the plans and specifications as amended.

After being advised that the project, at the time of trial, had still not been rehabilitated by the Navy, the Court, over objection by the Government, directed Britt's field notes, consisting of floor plans for each apartment upon which Britt and his partner, Waller, had placed certain symbols indicating the needed repairs and replacements, to be delivered to counsel for condemnee, and further instructed the parties to devote an intervening Sunday for the purpose of jointly surveying some of the units. Without detailing the errors found approximately one year after the date of taking, it is obvious that the Britt report and his testimony borders on fraud. A review of the testimony taken on the last day of trial fully establishes this suggestion.

 Upon consideration of all of the testimony, including the fact that the stoves, refrigerators and hot water heaters are limited in life and would have undoubtedly required replacement within a matter of five to eight years from the date of taking at the latest, and apportioning some of the replacements to deferred maintenance due to the exhaustion of the reserve for replacement fund, the Court finds that the deferred maintenance should be established at $80,000, with $45,000 being attributed to maintenance and $35,000 to replacements.

In arriving at any final value, the Court has not considered the potentiality of any rent increases. This is true even though the Basic Allowance for Quarters was increased 19% in July 1962, to be effective January 1, 1963. The last previous increase was in 1952 when the allowance was raised by 14%. While the Court agrees with the condemnee that F.H.A. would probably be reasonable in granting rental increases where the costs of operation are steadily increasing, it is generally the policy of F.H.A. to permit increases only to offset operational costs, thereby resulting in essentially the

same effective net income. We visualize that Allen Apartments would be confronted with a particularly difficult task of securing rental increases because of controversies pertaining to a windfall claim and the fact that the project analysis included an item for taxes on the property which did not require payment by the condemnee, although the project analysis contemplated same. Moreover, condemnee's valuation experts, although mentioning the possibility of a rental increase, did not apparently rely upon same in their final estimates.

 In arriving at the capitalization rate to be applied to effective net income, one must look at the economic life of the project. Only one witness, Rountrey, specified in years the economic life. He fixed the same at 40 years, but his explanation is far from satisfactory in that he stated that the leasehold interest was terminable at 50¼ years from the date of the lease; that it had been in operation for 10 years, and that the term of the lease "sets the life insofar as this appraisal is concerned." We do not agree that this method of determining the economic life of the project is appropriate. The reasons for Rountrey's opinion are patently unsound and must be rejected. United States v. Certain Interests in Property, 296 F.2d 264 (4 Cir., 1961). Perhaps Rountrey was erroneously advised as to the legal aspects of an economic life for, in United States v. Benning Housing Corporation, 276 F.2d 248 (5 Cir., 1960), there is a statement in the opinion which might lead to the belief that the economic life of the project is controlled by the term of the lease. However, in that case the Government was contending that it was the real owner of the property, subject only to condemnee's leasehold, and was therefore insisting that evidence of reproduction cost was inadmissible. It is unnecessary, of course, in the instant case to rule upon the admissibility of evidence relating to reproduction cost as the same is not in issue, but the Fifth Circuit, in

rejecting the Government's argument, had this to say:

"As pointed out above, both leases had in excess of sixty-five years yet to run as of the date of taking. Though the record indicates that it is entirely possible that the improvements here involved might outlast that period, the condemnee's interest is nevertheless not limited substantially by that fact. The present value of the Government's rights sixty-five years hence with respect to those improvements is negligible."

The foregoing does not, we hold, stand for the principle that the economic life of Allen Apartments necessarily runs until the Government, under the terms of the lease, has a right to cancel.

No other witness testified specifically as to the economic life of the project. Hogan described it as "common construction" with "bare minimal requirements," and that the "buildings are just not going to last." He said that, in his opinion, the mortgage will last longer than the buildings unless an appreciable amount is expended in maintenance which, in turn, would reduce the cash flow and effective net income. On the other hand, Hastings, in describing the three Wherry projects referred to under other sales [15] and stating that they had masonry exteriors requiring less maintenance than Allen Apartments, said:

"Except for the maintenance situation prevalent at Camp Allen, the economic life is approximately the same, but I have not yet found the buyer or a seller who would forecast for me the economic life of a project, whether it would endure the remaining period of the mortgage or not."

This statement partially conflicts with the testimony of Blechman, one of the purchasers of Pine Chapel Valley. Moreover, the economic life of a project is not essentially dependent upon the views of a buyer or seller.

Further, on the economic life of the project, Hastings points out that the de-

15. Barksdale Air Force Base, Fort Devens Manor, and Thomason Park, Quantico.

preciation in the earlier years takes place faster than the amortization of the mortgage but, later on, the amortization catches up and overtakes the depreciation. He figured a depreciation of $2\frac{1}{2}\%$ per annum. On this basis it would appear that the economic life may be 40 years *from the date of the lease*, but Hastings states that this is a composite depreciation covering refrigerators, stoves, and all equipment. He suggests that it will take approximately five years of income to catch up with deferred maintenance. Nevertheless, in capitalizing the effective net income it is conceded that the annual payment for the reserve replacement fund is included within the operating and maintenance expense item and, of course, if the reserve for replacements is deleted, the cash flow would increase.

■ The record does not include any other comments as to the economic life. Based upon the personal inspection of the project, the type of construction as revealed by the evidence, the provisions for maintenance, the anticipated abuse by tenants, the continuing need and demand, the length of the lease, and other related factors, the Court does not believe that the economic life of the project is 40 years from the date of taking. More realistically, the period is approximately 30 years. The Court's familiarity with the type of construction at Fort Bragg, where the units are slightly more substantially constructed than at Allen Apartments, lends strength to this conclusion if viewed from a comparison standpoint. In the Fort Bragg case,[16] the commission fixed a total economic life of 35 years and, with 5 years gone, established 30 years as the remaining

economic life under the 75-year lease. The district judge increased the remaining economic life of the project to 35 years. The appellate court affirmed. Based upon the type of construction alone, the Court would be inclined to further reduce the economic life of Allen Apartments, but the other factors tending to make up the economic life of Allen Apartments may be more favorable to this condemnee, and it is for this reason that the remaining period of 30 years is, in the opinion of the Court, fair and equitable. This, of course, affects the capitalization rate to be applied.

As stated in United States v. 190.71 Acres of Land in Lake County, Ill., 300 F.2d 52 (7 Cir., 1962): "A case of this character is susceptible of much confusion and uncertainty." The Court may have added to the confusion but, at least, the record has been carefully analyzed.

■■ Bearing in mind the importance of selecting a proper capitalization rate to the effective net income,[17] and considering Hastings' testimony that the proper overall capitalization rate as applied to effective net income would be 7.38%, as well as all the other pertinent facts and circumstances herein mentioned and as revealed by the record, including the degree of risk involved, the Court is of the opinion that a proper capitalization rate is 7.%, thus resulting in a total valuation of $2,485,714. Deducting the balance due upon the mortgage and the deferred maintenance of $80,000 leaves the sum of $367,161 as the value of the leasehold interest computed according to the capitalization of effective net income method of computation.

Further considering the cash-flow factor and other appropriate contentions as

---

16. United States v. Certain Interests in Property, 185 F.Supp. 555 (E.D.N.C., 1960), affirmed, 296 F.2d 264 (4 Cir., 1961).

17. An apparent slight differential in the percentage capitalization rate will produce amazing results. For example, applying Williamson's 6.4% rate to the effective net income found by the court will result in a total value of $2,718,750,

from which must be deducted the balance due on the mortgage ($2,038,553), plus deferred maintenance ($80,000), thereby leaving the value of the leasehold at $600,197. The capitalization rate as determined by the court results in a total value of $2,485,714, or a difference of $233,036 occasioned by selecting a capitalization rate which is $\%_{10}$ of 1% higher than Williamson's.

revealed by the record, the Court is of the opinion that the fair market value of the leasehold interest condemned on August 31, 1962, after making all proper deductions, is $340,000 for which judgment will be entered in favor of the condemnee, less any amount already paid. The judgment order shall carry interest on the excess over and above the amount heretofore paid to condemnee at the rate of 6% per annum from August 31, 1962. Present judgment order.